SOLAR KINETICS CORPORATION

v.

JOSEPH T. RYERSON & SON, INC., et al.

Civ. No. H–76–417.

United States District Court, D. Connecticut.

April 17, 1980.

Rolland J. Castleman, Lessner, Rottner, Karp & Plepler, P. C., Manchester, Conn., for plaintiff.

Bruce W. Manternach, and Edward F. Hennessey, Robinson, Robinson & Cole, Paul W. Orth, Hoppin, Carey & Powell, Scott P. Moser, and Raymond B. Green, Day, Berry & Howard, Hartford, Conn., for defendants.

## RULING ON COUNTERCLAIM

BLUMENFELD, Senior District Judge.

This case arose out of a contract dispute between Solar Kinetics Corporation ("Solar Kinetics") and Joseph T. Ryerson & Son, Inc. ("Ryerson") over alleged nonconformities in aluminum sold to Solar Kinetics by Ryerson. After a jury trial Solar Kinetics was awarded $69,343 in damages for its breach-of-contract claims. This ruling now resolves the issues raised in the counterclaim filed by Ryerson, which seeks a judgment for the outstanding balance due on the purchase price.

As its name suggests, Solar Kinetics was a company formed to harness the energy of the sun. In particular, Solar Kinetics sought to manufacture and sell a product which could efficiently utilize solar energy to heat swimming pools. When the company was originally incorporated in early 1975 its primary asset was a patent held by one of the incorporators, Leon T. Wilson, Jr., on a "collector tube." After experimenting with various prototypes, Mr. Wilson was convinced that the unique design of the collector tube made it an efficient instrument for rapidly heating water to very high temperatures. To do so, however, required that a large number of the sun's rays be collected and focused onto the tube. This conclusion, in turn, led to the design of the solar collector which the plaintiff ultimately sought to market.

The collector consisted of a piece of shiny metal four feet wide by five feet long which was molded into the shape of a parabola and then mounted onto a frame. The patented tube was attached to the frame and ran the length of the collector so as to

lie at the focal point of the collector's parabolic shape.

Parabolic shape was critical. Parabolic reflectors are unique in that when they directly face the sun, the light which is reflected from anywhere on their curved surface will pass through a single focal line. By locating a tube along that line, one is effectively able to concentrate the sunlight incident on a large surface area onto the tube. The principle is essentially the same as that which enables young children to set leaves on fire by placing them at the focal point of a magnifying glass.

Armed with this knowledge and with his patented tube, Mr. Wilson sought to incorporate a company which could market his device. With the assistance of James A. Pohlman who became president of the new company, and several other financial backers, Solar Kinetics Corporation was formed and immediately sought to procure the materials needed to construct the collectors. Mr. Pohlman made inquiries of various metal distributors, including Ryerson, in order to obtain the best possible metal to use for the reflective surface in the collector. As should be evident from the description of the collector's design, the single most desired feature in the metal was a highly reflective surface. The gauge and strength of the metal sheets, by contrast, were relatively unimportant.

Because the prototype had used "Alzac" aluminum sheets made by the Aluminum Company of America ("Alcoa"), Mr. Pohlman began his search for reflective metal by checking with various distributors to see if they could provide bulk rates on pre-cut sheets of "Alzac." When he called Ryerson, however, he was informed that Ryerson did not distribute products made by Alcoa. Instead, Ryerson offered to supply a comparable product made by its supplier, Reynolds Metal Co.

Mr. Pohlman was sufficiently interested to ask Ryerson to pursue the matter further and to present him with a quotation. Ryerson did so and several days later the parties entered into a contract. The contract provided that Ryerson would supply 12,000 pounds of 60″ x 48″ aluminum sheets which were to be "specular on one side with a guaranteed reflectivity of 80% as measured on the Gardner Pivotal Haze Meter." Deliveries were scheduled to take place within four to five weeks, and Solar Kinetics was obligated to pay within 30 days following delivery.

There were problems with the order from the outset. For a variety of reasons not relevant here the aluminum was shipped in several installments, the last of which did not arrive until December 1975, nearly five months after it was due. Moreover, the sheets sent turned out to be defective. Solar Kinetics used the sheets to make solar collectors and sent the product to retailers in Florida. These retailers, in turn, sold the products to ultimate consumers. Within a month, numerous reports were trickling back indicating that the product was not performing as promised. After several months of testing, Solar Kinetics concluded that the source of its problems was the reflective surface of Ryerson's product.

After several unsuccessful attempts to resolve their differences, efforts which will be described more fully later, Solar Kinetics filed suit in this court. It claimed damages for five distinct breaches of the contract: (1) the failure of the aluminum to have a reflective surface comparable to "Alzac's"; (2) the failure of the aluminum to have a surface with an 80% specular reflectivity; (3) the failure of the aluminum to be fit for use in solar collectors; (4) Ryerson's failure to provide sheets cut in four-foot lengths from a five-foot roll; and (5) Ryerson's failure to deliver on schedule. At trial the late-delivery claim was not permitted to go to the jury since Solar Kinetics was deemed, as a matter of law, to have waived its right to ask for damages on this breach. The jury then ruled for the plaintiff on the first three claims and for the defendant on the fourth.

Toward the end of the trial, both parties agreed to submit Ryerson's counterclaim to

the court for its ruling.[1] Plaintiff concedes that $20,378.70 is the unpaid balance of the purchase price which it agreed to pay to the defendant for certain aluminum sheets.[2] Neither party disputes that the sheets were in fact delivered and, with the exception of a few sheets damaged by inadequate packing and not relevant here, that the sheets were initially accepted by the plaintiff.

Conn.Gen.Stat.Ann. § 42a–2–709 provides in part:

"(1) When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under section 42a–2–710, the price (a) of goods accepted . . . ."

Based on this statute Ryerson claims to be entitled to the outstanding balance. Solar Kinetics advances two arguments as to why it is entitled to judgment.

## I. Submission of Counterclaim to Jury

■ First, it argues that the jury has already considered the counterclaim and has reduced its award to the plaintiff by an appropriate amount.[3] Thus, to grant de-

fendant's motion now would be to permit double recovery. As best it can be made out this argument is predicated on the following line of reasoning.

At the close of the damage branch of the bifurcated trial the jury was presented with interrogatories, including the following:

"2. Has the plaintiff proved that the defendant's breach of contract was the proximate cause of damages consisting of the necessary expenses it incurred in connection with actually manufacturing units which it was unable to sell (including those units it sold but for which it then made refunds)?

Yes _____ No _____

If the answer to question 2 is 'Yes,' then set forth the amount of such damages."

This question asked the jury in arriving at the damages to consider expenses which presumably included the cost of materials. Thus, argues the plaintiff, the jury's response should have included the cost of the aluminum—that is, the total purchase price

---

1. The parties are in dispute over the actual effect of their agreement to withhold the counterclaim from consideration by the jurors. Defendant's counsel argues that by the agreement, the parties intended to waive a jury trial as to the counterclaim and to submit the counterclaim to the court for its determination. Plaintiff's counsel insists that no such waiver was intended. Rather, he claims that he believed that the interrogatories submitted to the jury would resolve all of the factual questions necessary to rule on the counterclaim as a matter of law. His interpretation of the agreement was that it only removed a question of law from the jury but that the jury was still to be considered the trier-of-fact on the counterclaim.

In light of the conclusions concerning the collateral estoppel effect of the jurors' findings, discussed in the text *infra* at 1242–1244, it is not necessary to resolve this dispute. Whether this court is the trier-of-fact on the counterclaim and bound by all facts determined by the jury or whether the court is merely to apply the law to the facts found by the jury is unimportant; both possibilities yield the same result. In both the court is bound as far as the jury went, and in both the court is authorized to make findings of fact on questions which the jury has not reached. Fed.R.Civ.P. 49(a).

Neither party can now object to the failure of the court to submit additional interrogatories to the jury for resolving factual questions relating to the counterclaim. Both parties had ample opportunity to review and consider the questions actually sent to the jury and neither party requested that additional questions on this matter be submitted.

2. While throughout the trial plaintiff indicated that there was no dispute as to the amount of the outstanding balance due on the contract, the affidavit of James A. Pohlman submitted after trial appears to raise a question over the extent of Solar Kinetics' obligation. After concluding that $20,123.21 was due, Mr. Pohlman continued:

"The difference between Solar Kinetics statement of the net balance due Ryerson ($20,123.21) and the amount claimed due by Ryerson ($20,378.70) appears to be late charges added by Ryerson to its billing."

In light of plaintiff's stipulations during trial and in light of the fact that plaintiff still does not challenge the legitimacy of Ryerson's late charges, this court concludes that plaintiff has effectively agreed that the larger amount is due.

3. Nowhere in its brief does Solar Kinetics set out this argument. Rather, it is divined from some of the arguments advanced at the post-trial hearing and the affidavit submitted by Nathan A. Sigal, the plaintiff's accountant.

which Solar Kinetics was obligated to pay to Ryerson.

The jury answered this question by awarding $64,413. While it is generally difficult to establish where juries obtain their figures, both parties speculate that this figure was culled from Solar Kinetics' Financial Statement for the period of April 17, 1975 to March 31, 1976. The plaintiff offered this statement into evidence at trial where the $64,413 figure was designated as the value of inventory.[4] However, according to the affidavit of Mr. Nathan A. Sigal, accountant for Solar Kinetics, which was submitted to the court in support of this argument against liability on the counterclaim, the $64,413 inventory figure did not include the value of the aluminum sheets which he considered unfit for making solar collectors.[5] Consequently, the purchase price of the aluminum sheets which the plaintiff argues should have been included in the jury's answer to Interrogatory 2 was not.

If it had been properly included, the argument continues, the award against Ryerson on the plaintiff's complaint would have been increased by the amount Ryerson now seeks to recover on its counterclaim. Under those circumstances, it might be appropriate to grant the defendant an award on its counterclaim. However, plaintiff argues that if the amount claimed by Ryerson has already been excluded from the award it would be tantamount to a double recovery were the court to grant the defendant, in effect, a second set-off against the damages for which the jury found it liable.

Fundamentally, the problem with plaintiff's reasoning is that it asks the court in ruling on the counterclaim to take into account and correct an assumed error made by the jurors in their deliberations on the main action. Speculation on how jurors may have reasoned is a post-verdict game played by trial lawyers, but such speculations are not facts upon which a court may base a judgment.

The counterclaim was submitted for fair adjudication to the court by the agreement of both parties. The jury was never charged concerning the counterclaim and no arguments were made to the jury asking them to consider the counterclaim. Nor did any of the interrogatories posed to the jury ask them to consider the question. Whether the jury failed to take into account that the unused aluminum still in the plaintiff's possession was not included in inventory cannot be considered on this ruling. If plaintiff believed that the jurors had erred, it could have filed a motion for judgment n. o. v. or for a new trial under Fed.R.Civ.P. 50 and 59. Its suggestion that the jury verdict now be interpreted so as to defeat the counterclaim must be rejected. Rulings on counterclaims are not proper vehicles for the correction of jury verdicts.

4. No testimony was introduced to establish what was included within Solar Kinetics' "inventory." Presumably, in accordance with standard accounting practices, that term included the materials still in the possession of the plaintiff. The Financial Statement for the year ending March 31, 1976 states that "[t]he inventory figure was furnished by management."

5. The affidavit of Nathan A. Sigal reads in relevant part:

"3. The Financial Statement for the fiscal year ended March 31, 1976 (Plaintiff's Exhibit 84) was prepared by my accounting firm under my direction and control.

"4. In accordance with standard accounting practice, since the aluminum furnished by Joseph T. Ryerson & Son, Inc., to Solar Kinetics Corporation could not be used by Solar Kinetics Corporation in the manufacture of solar collectors, Solar Kinetics Corporation assigned no value to the aluminum for inventory purposes.

"5. The inventory value of $64,413.00 as of March 31, 1976 does not include any value for aluminum furnished by Joseph T. Ryerson & Son, Inc. to Solar Kinetics Corporation."

In view of the fact that Solar Kinetics' Financial Statement states that "[t]he inventory figure was furnished by management," paragraphs 4 and 5 of Mr. Sigal's affidavit are obviously hearsay. Furthermore, the hearsay is highly questionable because management (in the person of Mr. Pohlman) had not at that time offered to return the aluminum nor had it discovered what part the sheets played in the failure of solar collectors to work as expected. This is discussed more fully in the text, *infra* at 1247 *et seq.*

## II. *Revocation of Acceptance*

Plaintiff's second claim is that while Conn.Gen.Stat.Ann. § 42a–2–709(1) permits the defendant to sue for the purchase price of goods "accepted," Solar Kinetics effectively revoked its acceptance of the aluminum sheets by *offering to return them* to Ryerson. Revocation of acceptance is permitted pursuant to Conn.Gen.Stat.Ann. § 42a–2–608:

"(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it (a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or (b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

"(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

"(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them."

Solar Kinetics advances the argument that this question too has been settled by the special verdicts of the jury. It claims in its brief:

"The Court, recognizing that *for plaintiff to prevail on the issue of liability, it had to establish that it properly revoked its acceptance* of the aluminum, submitted the issue of revocation of acceptance to the jury." (Emphasis added).

Unfortunately, plaintiff's conception of both the nature of revocation and the nature of the questions submitted to the jury does not withstand close scrutiny.

 Under the terms of the Uniform Commercial Code ("UCC"), revocation and a suit for damages are two distinct remedies available to a buyer for a breach of contract. They are not alternative remedies, *Conte v. Dwan Lincoln-Mercury, Inc.*, 172 Conn. 112, 120, 374 A.2d 144 (1976), nor are they tied to each other in any way. The buyer may pursue either option or both if he pleases. "The remedy under [Conn.Gen. Stat.Ann. § 42a–2–608] . . . involves no suggestion of 'election' of any sort." UCC § 2–608, comment 1. The code itself treats the two remedies in two entirely different sections. Thus, the mere fact that the jury found Ryerson liable for a breach of contract does not, *ipso facto*, establish an effective revocation of acceptance.

Plaintiff nevertheless argues that even if an award for breach of warranty does not always embrace all the elements of a revocation of acceptance, the specific findings made by the jury in this case mandate such a conclusion. In support of this contention, plaintiff points to the findings of the jury which established that Ryerson had breached its contract, that these breaches were the proximate cause of substantial damage, and that Ryerson had received notice of Solar Kinetics' claims within a reasonable time after Solar Kinetics discovered the breach.[6]

### A. *Estoppel Effect of Jury Findings*

 Before considering whether the jury "touched all the bases," however, it is first necessary to consider the legal effect of these jury findings on a determination to be made by the court. Ryerson has argued that since the parties agreed to submit the

---

**6.** The jury answered the following interrogatories as indicated:

"Do you find, not considering possible late deliveries, that the defendant Ryerson breached its contract with the plaintiff Solar Kinetics? . . . Yes."

"Has the plaintiff proved that the defendant's failure to supply aluminum with a quality comparable to 'Alzac' aluminum, or alumi-

num with an 80% specular reflectivity, or aluminum fit for use in a solar collector was a proximate cause of some damage? . . . Yes."

"What is the total amount of reasonably foreseeable damages proximately caused by the defendant's breach of the contract? . . . $69,343."

counterclaim to a second trier-of-fact, that trier-of-fact is entitled to examine the record *de novo* and to make its own determinations. Thus, even where there is enough evidence in support of the jury's findings to withstand the defendant's motion for judgment n. o. v. or for a new trial, the court may still make independent conflicting findings of fact so long as evidentiary support exists for its findings. In other words, within the range of opinions where reasonable persons may disagree, Ryerson argues that the court is entitled to disagree with the jury.

Ryerson's position is buttressed by the fact that the traditional justifications for collateral estoppel are not applicable in a situation such as this. Normally, collateral estoppel arises where a trier-of-fact in an earlier trial decides a question of fact necessary to its verdict after both parties have had a full and fair opportunity to litigate the question. This fact is then deemed established as a matter of law in a subsequent trial between the same parties. *Corey v. Avco-Lycoming Division*, 163 Conn. 309, 317, 307 A.2d 155 (1972), *cert. denied*, 409 U.S. 1116, 93 S.Ct. 903, 34 L.Ed.2d 699 (1973); *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Roth v. McAllister Bros., Inc.*, 316 F.2d 143, 145 (2d Cir. 1963); *United Federation of Teachers Welfare Fund v. Kramarsky*, 451 F.Supp. 333, 337 (S.D.N.Y.1978). The general justification for the doctrine is two-fold:

> "Collateral estoppel, like the related doctrine of res judicata, has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation."

*Parklane Hosiery Co., Inc., supra*, 439 U.S. at 326, 99 S.Ct. at 649. However, in a case like this—one where both of the triers-of-fact have been in attendance at a single trial—estoppel cannot be justified as a means of protecting the parties or the courts from needless litigation. Thus, Ryerson's position that the doctrine of collateral estoppel is inapplicable under such particularized circumstances is not wholly without merit.

Nonetheless after careful consideration, I have concluded that it must be rejected. In addition to the general justification for collateral estoppel some courts have indicated yet another rationale for the doctrine:

> "[A]mong other things, the doctrine of collateral estoppel rests 'firmly on the need to avoid conflicting adjudications . . . . If possible the same parties should not be subject to conflicting determinations on the same point, both of which are binding.' . . . [T]his court, in furtherance of its responsibility to preserve the integrity of the judicial process, has a substantial concern in the consistent determination of any particular question. Were we to remand only the legal claims, we would create a situation ripe with the possibility of inconsistent determinations of the same question."

*Heyman v. Kline*, 456 F.2d 123, 131 (2d Cir.), *cert. denied,* 409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 88 (1972).

This justification for estoppel appears to have been applied in a case with facts analogous to those in the case now before the court. In *Caputo v. U.S. Lines Co.*, 311 F.2d 413 (2d Cir.), *cert. denied sub nom. Imparato Stevedoring Corp. v. U.S. Lines Co.*, 374 U.S. 833, 83 S.Ct. 1871, 10 L.Ed.2d 1055 (1963), a negligence action was brought by a longshoreman against the owner of a ship on which he was injured. The defendant and third-party plaintiff shipowner sought indemnity from the third-party defendant, a stevedore contractor. The indemnity cause of action was not severed from the jury trial of the negligence issue but, by agreement of the parties, it was submitted to the court for its determination. After the jury had found that the defendant's negligence in stowing cargo had caused the plaintiff's injury and that the defendant was liable to the plaintiff, the court adopted a contrary position, ruling that the defendant's negligence in stowing cargo was not the cause of the accident and that therefore he was not entitled to indemnity.

On appeal, the Second Circuit reversed:

"There is thus squarely raised the question of law whether, when the principal claim is tried to a jury and the third-party plaintiff's claim for indemnity is tried to the court, the court is bound by the verdict of the jury. There can be but one answer to this question. . . . Inconsistent determinations based upon the same evidence at the same trial are logically impossible. The court must follow the verdict of the jury."

*Caputo, supra,* at 416. *See also, Aiello v. City of Wilmington,* 470 F.Supp. 414, 419 (D.Del.1979). *Cf. Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); *Parklane Hosiery Co., supra,* 439 U.S. at 334, 99 S.Ct. at 653.

Were the court in this case to find a fact contrary to the facts found by the jury, the same parties might well be subject to "conflicting determinations on the same point, both of which are binding." If this court is to avoid this unseemly result, it must be estopped from questioning the facts as found by the jury.

B. *Required Notice of Revocation*

I now return to the point from whence I digressed. Given that the jury's special verdicts are now binding on the court, it remains for the court to decide the questions of fact, if any, which the jury has not yet resolved and which are necessary to a ruling on the counterclaim.

In *Conte v. Dwan Lincoln-Mercury, Inc., supra,* the Connecticut Supreme Court described the elements of proof necessary to establish revocation of acceptance under Conn.Gen.Stat.Ann. § 42a–2–608:

"Section 42a–2–608 of the General Statutes sets up the following conditions for the buyer who seeks to justify revoca-

tion of acceptance: (1) a nonconformity which substantially impairs the value to the buyer; (2) acceptance (a) with discovery of the defect, if the acceptance is on the reasonable assumption that the nonconformity will be cured, or (b) without discovery of the defect, when the acceptance is reasonably induced by the difficulty of the discovery or the seller's assurances; (3) revocation within a reasonable time after a nonconformity was discovered or should have been discovered; and (4) revocation before a substantive change occurs in the condition of the goods not caused by their own defects." 172 Conn. at 120, 374 A.2d at 148.

In light of this court's consideration of the third condition, "revocation within a reasonable time," it is not necessary for the court to decide whether Solar Kinetics has met its burden of proof with respect to the first, second and fourth conditions. For the purpose of this ruling, it may be assumed that the jury's findings established that Solar Kinetics has satisfied these conditions.[7] As to the third condition, however, I conclude that there remains an issue of fact for this court to decide.

Since revocation "is not effective until the buyer notifies the seller of it," Conn. Gen.Stat.Ann. § 42a–2–608(2), the third condition is met only if the buyer gives the seller effective notice of revocation within a reasonable time after the buyer knew or should have known of the seller's breach. Plaintiff insists that the jury has already decided this question and seeks to support this claim by reference to the following interrogatory:

"Do you find that the plaintiff has shown by a fair preponderance of the evidence that it gave Ryerson notice of any of its claims within a reasonable time

---

7. The jury findings have established that the failure to provide aluminum with a specular reflectivity of 80% caused the plaintiff to suffer nearly $70,000 in damages. Thus, it might well be that they have established that a nonconformity in the goods substantially impaired the value to the buyer. The findings also might be deemed to estop the defendant from contesting the conclusion that the problem with specular reflectivity was a nonconformity existing at the

time of acceptance which was not known and was difficult to discover. Finally, with respect to the fourth condition, plaintiff has indicated that it still holds the aluminum sheets in question and is still willing to return them. It appears likely that no evidence can be produced which would tend to show that there has been a substantial change in the condition of the sheets.

after it knew or should have known of any breach of the contract by Ryerson?"

While the jury did answer this question in the affirmative, its finding does not, contrary to plaintiff's assertion, amount to a finding of notice of revocation. In order to have found that Ryerson was liable to Solar Kinetics for breach of warranty, the jury was only required to find that a notice of breach was given to the seller pursuant to § 42a–2–607(3).[8] The content of the limited notice necessary to preserve a claim for damages need only "be sufficient to let the seller know that the transaction is troublesome and must be watched." UCC § 2–607, comment 4. The official comments to the section on revocation, however, make it clear that the *content* of notice required under § 2–608 is generally more than "the mere notification of breach" required under § 2–607. *See also, Kohlenberger, Inc. v. Tyson's Foods, Inc.*, 256 Ark. 584, 591, 510 S.W.2d 555, 14 UCC 1281 (1974); *Lanners v. Whitney*, 247 Or. 223, 234, 428 P.2d 398, 4 UCC 369 (1967); *Allis-Chalmers Corp. v. Sygitowicz*, 18 Wash.App. 658, 661, 571 P.2d 224, 22 UCC 1151 (1977). Consequently, when the jury concluded that adequate § 2–607 notice had been given, it had no occasion to consider and rule on the question of whether or not Solar Kinetics had given the more extensive § 2–608 notice necessary for revocation.

Nor does the language of the question itself suggest that the jury was being asked to make more extensive findings than were necessary to resolve the breach-of-warranty claim. All the question asks is whether notice of "any claim" was given. When the

question is considered in light of the oral instructions given to the jury,[9] it is clear that the jury was asked only to find whether Ryerson was given the limited notice required by § 42a–2–607. Thus, it is clear that the jury's affirmative answer to the question concerning adequate notice of breach of contract does not estop this court from reaching a different conclusion with respect to the notice required for revocation. Under Connecticut law the jury's determination "is conclusive between the parties in a second suit only as to questions actually litigated and determined . . . . It is not conclusive as to questions which might have been but which were not litigated in the original action." *Marcus v. Marcus*, 35 Conn.Supp. 205, 210, 404 A.2d 127, 130 (1979).

While the various authorities who have considered the question have uniformly insisted that a notice of revocation must contain more than a mere notice of breach, they differ widely over how much more. Some have suggested that as little as conduct manifesting a buyer's desire to get his money back will suffice. Thus, for example, where a buyer who purchased a mobile home on credit ceased to make his monthly payments after complaining about problems with the trailer, he was deemed to have notified the seller of his revocation. *Performance Motors, Inc. v. Allen*, 280 N.C. 385, 397, 186 S.E.2d 161, 10 UCC 568 (1972). An intermediate position requires the buyer to notify the seller that he considers the seller to be in breach and that he desires to revoke his acceptance as to particular

8. Conn.Gen.Stat.Ann. § 42a–2–607(3) provides in pertinent part:

"Where a tender has been accepted (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . . ."

9. The oral instructions given to the jury included the following language which was taken virtually verbatim from the official comments to § 2–607:

"The content of the notice need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. In other words, he's saying

'There's a problem with this stuff and I might have a claim here.' There is no reason to require that the notification which saves the buyer's rights must include a clear statement of all the objections that will be relied on by the buyer. Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. You don't have to say 'I'm going to sue you,' but the notification which saves the buyer's rights, that would be Solar Kinetics, need only be such as informs the seller that the transaction is claimed to involve a breach."

goods. The strictest test was recently set forth in the case of *Lynx, Inc. v. Ordnance Products*, 273 Md. 1, 327 A.2d 502 (1974), where the court held that notice of revocation "should inform the seller that the buyer has revoked, identify the particular goods as to which he has revoked and set forth the nature of the nonconformity . . . ." 273 Md. at 16, 327 A.2d at 513. Connecticut courts have not yet considered this specific question. Consequently, it is the function of this court to "choose the rule that it believes the state court, from all that is known about its methods of reaching decisions, is likely to adopt in the future." Wright, *Law of Federal Courts* § 58, at 271 (2d ed. 1976); *see In re Leasing Consultants, Inc.*, 592 F.2d 103, 109 (2d Cir. 1979); *Marina Management Corp. v. Brewer*, 572 F.2d 43, 46 (2d Cir.), *cert. denied*, 439 U.S. 829, 99 S.Ct. 104, 58 L.Ed.2d 123 (1978); *Gordon v. Motel City "B" Associates*, 403 F.2d 90, 92 (2d Cir. 1968).

An examination of the only reported Connecticut case which construes the UCC section on revocation reveals that the state court was heavily influenced by the official comments to the UCC and by cases in foreign jurisdictions which construed identical provisions in their respective acts. *Conte v. Dwan Lincoln-Mercury, Inc., supra.* It is reasonable to assume that Connecticut courts would again consider such sources in resolving this question.

As indicated above, the case law is varied. However, consideration of the cases reveals two significant trends. First, those cases which have found an effective notice of revocation based on minimal communications with the seller are generally cases where the dissatisfied buyer is the ultimate consumer. The notice required for revocation is generally more content-specific in a transaction between merchants. *Compare Performance Motors, Inc. v. Allen, supra,* and *Fenton v. Contemporary Development Co., Inc.*, 12 Wash.App. 345, 529 P.2d 883, 16 UCC 411 (1974) *with Lynx, Inc. v. Ordnance Products, supra,* and *Desilets Granite Co. v. Stone Equalizer Corp.*, 133 Vt. 372, 340 A.2d 65, 17 UCC 769 (1975).

Second, courts have been reluctant to allow a buyer in litigation to justify his earlier attempted revocation by reference to defects in the goods which he only discovered after the supposed revocation. *Desilets Granite Co. v. Stone Equalizer Corp., supra; cf. Lanners v. Whitney, supra.* Both of these trends are in accord with the policy expressed in the UCC official comment 5 to § 2–608, which provides:

"The content of the notice under subsection (2) is to be determined in this case as in others by considerations of good faith, prevention of surprise, and reasonable adjustment. More will generally be necessary than the mere notification of breach required under the preceding section. On the other hand the requirements of the section on waiver of buyer's objections do not apply here. The fact that quick notification of trouble is desirable affords good ground for being slow to bind a buyer by his first statement. Following the general policy of this Article, the requirements of the content of notification are less stringent in the case of a non-merchant buyer."

The first line of cases is in accord with the code's stricter treatment of interactions between merchants. The second line of cases adopts a rule designed to prevent surprise and to allow the seller to have an opportunity to make a reasonable adjustment with the buyer. Where the seller does not know the grounds for revocation it may be substantially prejudiced in its efforts to respond reasonably and in good faith to a supposed revocation. Thus, both of the rules adopted by other courts serve to highlight aspects of the official comment.

In light of these considerations, it is my prediction that Connecticut courts, if faced with this question, would embrace the rationale and test established by the Supreme Court of Maryland in *Lynx, Inc. v. Ordnance Products, supra,* at least with respect to transactions between merchants:

"While notice of any breach as a basis for rejection of the goods (under § 2–607) preserves the buyer's remedy of damages if given within a reasonable time after

the breach was or should have been discovered, revocation of acceptance (under § 2–608) is not accomplished by notice of 'any' breach but requires that the notice be given of the nonconformity in the goods materially impairing their value to the buyer and must be given within a reasonable time after the buyer discovers or should have discovered such nonconformity. *See Lanners v. Whitney*, 247 Or. 223, 428 P.2d 398 (1967). *See also* 2 Anderson, *supra*, § 2–607:31; J. White and R. Summers, Sec. 8–3, *supra*, at 260; 1 W. Hawkland, A Transactional Guide to the Uniform Commercial Code § 1.4105, at 245 (1964).

"A buyer does not sustain his burden of proving that his revocation of acceptance was justified by his testimony that the machine was returned because it was 'unsatisfactory,' as that term is held to be too vague. . . .

"As with a notice of breach under § 2–607, no particular form or content is specified by the UCC for revocation of acceptance. Official Comment No. 5 to § 2–608 states that the content of the notice is to be determined 'by considerations of good faith, prevention of surprise and reasonable adjustment. More will generally be necessary than the mere notification of breach required under the preceding (§ 2–607) section.' (§ 2–608)

"The criterion of good faith and the consideration that a speedy inexpensive method of operation is desirable, lead to the conclusion that the form and content of such notice of revocation should inform the seller that the buyer has revoked, identify the particular goods as to which he has revoked and set forth the nature

of the nonconformity since such notice would corroborate the buyer's good faith and give the seller an opportunity to make a substitute performance to maintain good will or to avoid litigation. *See* 2 Anderson, *supra*, § 2–608:16."

*Lynx, supra*, 273 Md. at 15, 16, 327 A.2d at 513.

All that now remains is to apply this test to the facts as they were developed at trial. After reviewing all the evidence I am persuaded that the notice of revocation given Ryerson did not satisfy the *Lynx* standard and was, therefore, ineffective. In particular, I find that Solar Kinetics failed to specify an actual nonconformity on which it was relying to revoke.

With respect to notice, the evidence established that in the spring of 1976, Mr. James Pohlman, the president of Solar Kinetics, informed the defendant that the aluminum he had received was "not meeting specifications" and he encouraged the defendant to make some tests of its own. At this time Mr. Pohlman may have complained generally about "reflectivity." He did not, however, refer to "specular reflectivity" or to "Alzac," nor did he purport to revoke his acceptance or offer to return the aluminum.[10] This notice was adequate to satisfy § 2–607(3) requirements but clearly, under the *Lynx* test, does not constitute a notice of revocation.

After hearing from Mr. Pohlman, Ryerson then sent samples to be tested by Electrical Testing Laboratories, Inc. ("ETL") and received test reports which showed the *total* reflectivity to be in excess of 80%. Believing that the contract only required 80% *total* reflectivity,[11] Ryerson forwarded

**10.** The trial testimony on this point is contained in the following short colloquy:

"Q All right. Upon receipt of that test result what did you do?

" . . .

"[MR. POHLMAN]: I notified Joseph T. Ryerson that it was our opinion the material was not meeting specifications, and they were to conduct their own reflectivity tests and advise me what they were.

"THE COURT: When you received the test results you advised who?

"THE WITNESS: Joseph T. Ryerson.

"THE COURT: Ryerson.

That the product didn't meet the reflectivity requirement, right?

"THE WITNESS: We felt that it did not meet the reflectivity requirement.

"THE COURT: Or standard provided for?"

"THE WITNESS: Right, sir."

**11.** During the liability phase of the trial, one of the hotly contested questions was the interpretation of the specifications set forth in the contract. The disputed language read as follows:

a copy of the report to Mr. Pohlman and indicated that it believed that it was in compliance with the terms of the contract. Mr. Pohlman responded but still did not refer to a breach of the 80% *specular* reflectivity requirement.[12]

Following this interchange of correspondence Solar Kinetics continued to test the aluminum in an effort to ascertain why the collector was not achieving the desired results. Mr. Pohlman claims finally to have stumbled on the problem in June of 1976. By reflecting a laser beam off the surface of the aluminum onto a white wall, Mr. Pohlman discovered that the direction of the grain of the metal affected the diffu-

sion of the light beam. When the grain ran vertically the reflected rays were spread in a pattern on the wall. But when the aluminum was turned 90 degrees, the light was concentrated onto a single line.

Mr. Pohlman then apparently reviewed the contract and concluded that his problems stemmed from the way in which the sheets had been cut from the roll. Instead of giving him 48″ cuts from rolls 60″ wide, he had been sent sheets which were cut in 60″ lengths from a 48″ roll. Thus, the grain direction was rotated 90 degrees from the direction he desired.

Looking at his purchase order, Mr. Pohlman decided that Ryerson had breached a

---

"Aluminum Sheet 5657 .# 25 *Specular on one side with a guaranteed reflectivity of 80%* . . . ." (Emphasis added). Ryerson argued that this meant aluminum sheets with a mirrored finish on one side and with a guaranteed total reflectivity of 80%. Solar Kinetics argued that it had been promised aluminum sheets with a guaranteed specular reflectivity of 80%.

As it was explained at trial, the total reflectivity value is ascertained by measuring the light rays reflected from the surface of the metal as a percentage of the total light rays incident on the surface. Total reflectivity, in turn, is made up of two components: specular and diffuse. Specular reflectivity measures the amount of light which is reflected off the surface of the metal *at the same angle as the incident light ray struck the surface*. All the remaining reflected light rays, that is, those rays which are reflected but scattered in arbitrary directions, constitute the diffuse reflection. Thus, an 80% specular reflectivity guarantee creates a higher standard than an 80% total reflectivity guarantee.

While the jury ultimately resolved this question in favor of the plaintiff, it was quite evident from the proof at trial that Ryerson believed in good faith that the contract called only for 80% total reflectivity.

**12.** Mr. Pohlman responded with the following short letter:

"Dear Mr. Murphy:

"Thanks for forwarding the ETL report dated June 22, 1976.

"I was extremely disappointed in that there was no data included regarding the total reflectivity and diffuse reflectivity over the wave length of 400 to 750 millimicrons. In addition to this, we did not receive maximum and minimum percentages of reflectivity or the number of readings taken to estimate the average. We feel that this is significant in-

formation and should be included in the next test report that you are forwarding to us.

Very truly yours,
James A. Pohlman

President"

While it might be argued that the oblique reference to total and diffuse reflectivity was intended to put Ryerson on notice that plaintiff considered specular reflectivity to be the proper test, this court is unwilling to attribute such significance to it. Mr. Pohlman was a graduate engineer and an expert in the field of solar collectors. He was dealing with a general metal distributor which had no particular experience with highly reflective metal apart from a limited number of sales of reflectors in electric light fixtures. He stressed, according to his own testimony, the importance of an 80% *specular* reflectivity requirement when he negotiated the contract. It is extremely difficult to imagine that upon receiving test scores indicating a *total* reflectivity of over 80%, Mr. Pohlman would have used this letter to complain that the wrong standard was being used. In fact, at trial, even Mr. Pohlman was unwilling to attribute this significance to his letter.

"[MR. POHLMAN]: Yes, I did send this letter. The contents are as follows:
'Dear Mr. Murphy: Thanks for forwarding the ETL report dated June 22nd, 1976. I was extremely disappointed in that there was no data included regarding the total reflectivity and diffuse reflectivity over the wavelength of 400 to 750 milli-microns'.
"Q What is 400 to 750 milli-microns?
"A The visual spectrum of light.
"Q Now, what do you mean that you were disappointed at that report, that it did not contain it? In what sense were you disappointed?
"A I couldn't believe that between 400 and 750 milli-microns that all the readings are going to be precisely the same. I thought there would have to be some variation, if only in instrumentation.
"Q All right."

contractual obligation by sending Solar Kinetics sheets cut from 48″ rolls.[13] Consequently, he scheduled a meeting for August 30, 1976, with representatives of Ryerson and Solar Kinetics. At that meeting he sought to document this complaint about grain direction and offered to return the unused aluminum. Ryerson refused to accept the offer.

This was the only other notice given to Ryerson, and this notice was ineffective as well. Although at this time Solar Kinetics specified that it was revoking the contract, it sought to justify its revocation on the grounds that the orientation of the grain constituted a nonconformity which substantially impaired the value of the aluminum. However, the jury specifically found that the grain orientation was *not* a nonconformity,[14] let alone a nonconformity which substantially impaired the value of the goods. Thus, this notice failed because it was inadequate to apprise Ryerson of any particular "nonconformity" on which revocation could be based. To claim now that Solar Kinetics would have been entitled to revoke for Ryerson's failure to provide aluminum with an 80% *specular* reflectivity fails to grasp the justification for the notice requirement. Absent an indication of a particular nonconformity, a seller has no basis for evaluating the legal effect of an attempted revocation or for working out

adjustments in order to avoid litigation. Here Ryerson justifiably believed that Solar Kinetics was only complaining about grain direction. Since it was entitled to assume that it had not breached its obligation with respect to the direction of the grain, it reasonably refused to accept a return of the special-order aluminum sheets. After all, plaintiff was a commercial buyer, not a consumer, and the nonconformity upon which it now relies was known or should have been known to it as early as April 1976. *See* note 15, *infra*. Ryerson was a supplier of aluminum but not a consultant on solar reflectivity. By contrast, plaintiff's management included the inventor of the solar collector and Mr. Pohlman, a self-described reflectivity expert. *See* note 12, *supra*. To allow plaintiff retroactively to buttress its attempted revocation with a subsequently discovered "nonconformity" would defeat the entire purpose of the notice requirement.

■ Effective notice is an absolute prerequisite to the revocation of acceptance. Since Solar Kinetics failed to set forth the particular nonconformity on which it was relying to revoke, its attempted revocation was ineffective.[15] The sheets of aluminum were accepted by Solar Kinetics, and that acceptance has not been revoked. Thus, under Conn.Gen.Stat.Ann. § 42a–2–709, Ryerson is entitled to the balance of the

13. Solar Kinetics based this claim on the description of the aluminum sheets in the contract. The sheets were to be "60 [inches] × 48 [inches] × .020 [inches] thick." It was the plaintiff's claim that by industry standards the first measurement always referred to the width of the roll. Ryerson disputed this interpretation and argued alternatively that plaintiff had agreed to a change after it had been explicitly told by Ryerson that 48″ rolls were the largest rolls available. The jury agreed with Ryerson and concluded that Ryerson had not breached the contract by providing aluminum cut from 48″ rolls.

14. The jury responded in the negative to the following interrogatory:

"Do you find that Ryerson is liable to Solar Kinetics for its failure to supply aluminum cut from 60-inch rolls?"

15. There is substantial evidence to support the jury's finding that the notice of breach required under § 42a–2–607(3) was given within a rea-

sonable time after the breach was discovered. As early as April, Ryerson was informed that the transaction was "troublesome and must be watched." While the comments to the code indicate that a reasonable time to give notice of revocation is generally longer than a reasonable time to give notice of breach, UCC § 2–608, comment 5, plaintiff was clearly not entitled to wait indefinitely. As early as April 27, 1976, Mr. Pohlman had information which should have put him on notice that the aluminum supplied failed to meet the 80% specular reflectivity requirement. Arguably, by waiting until August to attempt to revoke, plaintiff had already delayed beyond a reasonable time. Certainly, any delay beyond the August meeting constituted an excessive delay. While there was no evidence as to when Ryerson was finally informed of the complaint over specularity, it is worthy of note that the complaint filed by the plaintiff in October of 1976 still did not mention the word "specular."

## 1250

purchase price.[16] Judgment shall enter for Ryerson on its counterclaim in the amount of $20,378.70, with interest from January 31, 1976 at the rate of 8% per annum.[17]

SO ORDERED.

**16.** There is a possible alternative procedural basis for granting judgment to Ryerson. A review of the pleadings indicates that Solar Kinetics never filed a reply to Ryerson's counterclaim. Under Fed.R.Civ.P. 7, a reply to a counterclaim is a "required" responsive pleading. *Aktiebolaget Stille-Werner v. Stille-Scanlan, Inc.,* 1 F.R.D. 395, 396 (S.D.N.Y.1940); 2A *Moore's Federal Practice* ¶ 7.03 at 1533.

Fed.R.Civ.P. 8(d) provides that:

"Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading . . ."

Thus, where no reply is filed to a counterclaim, the averments of the claim are deemed admitted. *Peters & Russell, Inc. v. Dorfman,* 188 F.2d 711, 712–13 (7th Cir. 1951); *Atkinson v. Atkinson,* 167 F.2d 793, 795 (7th Cir. 1948).

Moreover, the Federal Rules require that affirmative defenses be set forth in any answer or reply. Fed.R.Civ.P. 8(c). Revocation of acceptance is just such an affirmative defense. *Allis-Chalmers Corp. v. Sygitowicz, supra,* 18 Wash.App. at 660–61, 571 P.2d 224 (construed Washington law of procedure which is taken verbatim from Fed.R.Civ.P. 8(c) to require that revocation of acceptance be pled as an affirmative defense). Solar Kinetics' failure to plead such a defense affirmatively might be deemed sufficient to bar the defense at this stage of the proceeding. However, since neither party has raised this issue and since the court has not had the benefit of briefing on the possible effect of Fed.R.Civ.P. 15(b), I am not disposed to rest on procedural grounds.

**17.** Conn.Gen.Stat.Ann. § 37-3a provides that Ryerson may be allowed 8% annual interest from the time when the money was due and payable. *Cecio Bros., Inc. v. Feldmann,* 161 Conn. 265, 287 A.2d 374 (1971).

Under Connecticut law "the determination of whether interest is a proper element of damages is to be made in view of the demands of justice, not through the application of any arbitrary rules; . . . whether a sum of money has been liquidated may be useful, but is not a controlling factor; and . . . the allowance of interest is primarily an equitable determination to be made within the discretion of the trial court." *Scribner v. O'Brien, Inc.,* 169 Conn. 389, 405–06, 363 A.2d 160, 169 (1975).

In this case, where there is no dispute as to the amount outstanding, where both parties have conceded that the obligation remains unsatisfied and where both parties are commercial enterprises, justice requires that Ryerson be allowed to recover interest for the loss of the use of its money. Simple interest at 8% is computed from January 31, 1976, 31 days after Solar Kinetics received its last shipment of aluminum.