In re G. S. F. CORP., Debtor.

G. S. F. CORP., Plaintiff,

v.

SANDELL MANUFACTURING COMPANY, INC., Defendant.

Bankruptcy No. 80–230–HL.
Adv. No. 80–0521.

United States Bankruptcy Court,
D. Massachusetts.

Nov. 10, 1980.

Gary W. Cruickshank, Riemer & Braunstein, Boston, Mass., for plaintiff/debtor.

Sidney Gorovitz, Hurtz, Pizzella & Gorovitz, P. C., Boston, Mass., for defendant.

## FINDINGS OF FACT, RULINGS OF LAW

HAROLD LAVIEN, Bankruptcy Judge.

This is an action brought by the Plaintiff, G. S. F. Corp., Debtor–in–Possession under Chapter 11, against the defendant, Sandell Manufacturing Company, Inc. for goods sold and delivered, but not paid for. Defendant counterclaims for damages due to allegedly defective goods sold to it by the Plaintiff.

Specifically, G. S. F. delivered a shipment of polyurethane foam to Sandell in February of 1980, for which Sandell has, admittedly, not paid. Sandell defends and counterclaims against G. S. F. alleging that the foam was defective and that it did not perform according to specifications. Sandell seeks damages for the alleged defects.

G. S. F. Corp. is engaged in the manufacture of polyurethane foam, primarily for use in bedding, furniture and packaging. The parties have been dealing with each other since 1975, when Sandell placed its first order for foam with G. S. F. Although Sandell's counsel talked of a specific formula which Sandell submitted, there was no actual evidence of any such formula, and I find that all orders for Sandell were filled from a G. S. F. stock formula which was changed at Sandell's request for the shipment in question to reduce the cost by eliminating the fire resistant component.

Sandell treated the polyurethane foam with polymers in a manufacturing process that yielded a waterproof sealant, called Polytite, for use in construction joints. This process required the foam to be open–celled to enable it to absorb the polymers in the Sandell treatment. I note at the outset, however, that G. S. F. foam, like all polyurethane foam, is not in and of itself a natural waterproof material. Quite the contrary, it is a water absorbent material. It was only Sandell's treatment of the foam which made it a waterproof sealant. The cellular structure of G. S. F.'s product, however, ultimately affected the effectiveness of Sandell's treatment. Interestingly, the less perfect the cell formation, the better, since the success of the treatment required the filling of the cells with polymer and, therefore, the more broken walls between cells, the more readily the polymer flowed between cells.

The evidence indicated that the parties were dealing with each other on satisfactory terms since 1975 until the last shipment of foam was delivered by G. S. F. to Sandell in February, 1980. This shipment was of standard 3000 molecular weight foam but manufactured according to a formula which left out what was considered to be an unnecessary fire retardant. There was no evidence to indicate that the lack of the fire retardant rendered the foam unfit for the Sandell polymer treatment.

On February 15, Sandell picked up the first batch of the February shipment. Max Wasserman, the general manager of Sandell and the inventor of Polytite, testified that the foam looked so bad to him that within a week, he had run his in house tests and was aware of the problem. He then called in Joe Hartigan, the G. S. F. salesman who handled the Sandell account, to demonstrate the inability of this foam to absorb the polymer and become waterproof. He also complained that the material looked different and was not cut to uniform widths and was torn at the ends. Wasserman even

performed a test for Hartigan in which he simulated the Sandell treatment on the foam. Two pieces of foam were placed in liquid, one of the pieces absorbed the liquid, the other did not. It was Wasserman's claim that the piece which did not absorb the liquid was a piece of the G. S. F. foam from the February shipment.[1] Hartigan relayed Wasserman's complaint to Frank Ippollito, sales manager of G. S. F. who, according to Wasserman, visited him between February 20th and 25th and, in any event, before the letters of March 5 and 6, and I so find. Both Hartigan and Ippollito suggested the return of the foam. However, Wasserman said that although Sandell still had the majority of the foam in its possession, that as a result of their testing, they were satisfied that they could make the foam watertight by increasing the amount of polymer. Wasserman indicated that Sandell was going to fill some of its overseas orders by using the foam and, instead of returning the foam, insisted on a 20% credit.

The meetings were followed up by a letter, dated March 5, from Wasserman to G. S. F., in which Wasserman indicated that the February order contained a minimum of 20% wastage, which he was deducting from the bill, that if Sandell were not in a rush for the foam, they would have sent the entire load back, and that this was the worst material Wasserman had ever seen from any manufacturer. This letter was followed by another one, dated March 6, from the treasurer of Sandell to G. S. F., adjusting the charges for the February shipment to reflect a 20% credit for waste. Neither letter rejected the material or offered its return, or refused payment but, in fact, agreed that after taking the 20% credit, $5,839.47 was due.

Sandell delivered a batch of Polytite which was manufactured from the February, 1980 delivery of G. S. F. foam to the E. B. Jones Construction Company on March 4, 1980. Because of complaints from E. B. Jones, Sandell took back all the material it had shipped and issued a credit to E. B. Jones for $1,800.00.

Starting May 20, 1980, and continuing through July, despite its knowledge of the problems and its ability to purchase and, in fact, its actual purchases of substitute foam, during this period, from Rogers, another supplier, Sandell delivered Polytite to a construction job at the Baltimore Stadium. Because of complaints about the Polytite, Sandell took back the defective material at no charge and issued credits, spending in total, approximately $14,000.00. In addition, Sandell claims to have approximately $3,000.00 of G. S. F. foam on hand which it cannot use because of a defect in its cell structure which does not allow the foam to be successfully treated by Sandell.

No evidence was offered by Sandell as to its ability or inability to buy substitute foam from Rogers or any other supplier at any specific period of time nor at what price it was making the purchases when it, in fact, in the late Spring, started to purchase foam from Rogers. No invoice or other specific evidence was offered as to the first Rogers purchase, nor was any evidence offered as to how long it took Sandell to process the foam.

Prior to the debtor bringing suit and Sandell answering by counterclaim, Sandell offered no evidence of any notice of revocation of acceptance or claim of breach of warranty, other than its claim of credit in the letters of March 5 and 6.

There was no evidence offered of negligence or other cause for the February foam not being suitable other than the alleged unaccounted for difference in cell structure.

These were the only two orders on which credit was given because of complaints of

---

1. An independent laboratory also performed a photo micrograph on two pieces of foam which showed one piece with a regular and complete cell structure, the other with irregular and broken cell walls. Polyurethane foam itself is like a sponge and has no waterproof qualities. Its waterproofing capacity comes from its ability under the Sandell process to absorb and retain polymer under pressure. The more irregular and broken the cell walls, the greater its absorbent capacity. The complaint here is that the cell structure of the February shipment was too regular and complete; however, this test process failed to complete a chain of identity of the samples so that I cannot find which sample in Exhibit 7 comes from which source.

unsatisfactory performance, although Sandell used the foam and its modified process to fill an undetermined number of orders. Sandell's argument is that the defects in the February shipment of foam caused a breach of contract by G. S. F., thereby entitling Sandell to damages. This claim is without merit under the applicable law and under the facts as I have found them.

First, Sandell accepted the February order and, even assuming arguendo that it was entitled to revoke that acceptance, it failed to properly do so. In order for breach of contract to entitle a buyer to revoke his acceptance, it is required that the buyer notify the seller of his revocation, that the revocation occur within a reasonable time after discovery of the grounds, that the non–conformity substantially impair the value of the goods to the buyer, and that the revocation occur before any substantial change in the condition of the goods which is not caused by their own defect. See M.G.L. Ch. 106 § 2–608 and *Fargo Mach. & Tool Co. v. Kearney & Trecker Corp.*, 428 F.Supp. 364 (1977). Taking these requirements in order, I find that Sandell did not notify G. S. F. of its intent to revoke acceptance. The only notification Sandell gave G. S. F. was a letter dated March 5, which expressed Sandell's displeasure with the foam and of its intent to reduce the purchase price by the agreed credit of 20%. This notice was insufficient. Although notice need not be in any particular form, it must do more than inform the seller of the defects and of the buyer's dissatisfaction; the notice must inform the seller that the buyer does not want the goods and does not desire to retain them. *Solar Kinetics Corp. v. Joseph T. Ryerson & Son, Inc.*, 488 F.Supp. 1237 (1980), 29 U.C.C. Rep. 85 (1980); *Hays Merchandise, Inc. v. Dewey*, 78 Wash.2d 343, 474 P.2d 270 (1970).

Here, just the opposite occurred. Both G. S. F.'s salesman and sales manager offered to take the goods back and Sandell, at a time when it was fully aware of the problem, not only declined but, further, stated that it could make the foam do by an enrichment of its process and agreed to a 20% reduction in price. This price adjustment was confirmed in Sandell's letters of March 5 and 6.

Any attempted revocation of acceptance by Sandell did not occur within a reasonable time. Whether the buyer has revoked within a reasonable time, after he discovered or should have discovered the non–conformity, depends on the particular circumstances of the case. *Fargo Mach. & Tool Co., supra.* Where complicated machinery which has long period of ironing out is involved, notification of buyer's revocation of acceptance will necessarily take a longer time than where a relatively simple, easily inspected item such as foam is involved. Wasserman testified that he was aware of several defects in the foam as early as February, 1980. In fact, by the end of February, he was satisfied that the foam used in his regular process did not become water resistant but rather continued to absorb water. Also, in February, the G. S. F. sales manager offered to take back the entire shipment, but Sandell declined the offer. Revocation of acceptance should have occurred then. Instead, Sandell chose to take a price adjustment, alter its process, and keep and use the foam. Having made his choice, Sandell cannot now determine that G. S. F. should bear responsibility for its error in judgment.

In regard to the impairment of value question, we are concerned with determining impairment to this particular buyer. *Fargo Mach. & Tool Co., supra; Hays Merchandise v. Dewey, supra.* On the evidence before me, there is not a substantial enough showing of damage to warrant the conclusion that the defects complained of substantially impaired the value to Sandell. There was evidence to indicate that Sandell was able to use the foam for its manufacturing process if certain chemical adjustments were made. In fact, Sandell used the foam for filling several foreign and domestic orders and only received two complaints, concerning which there was no evidence that the foam was the sole or even contributory cause of the problem. Presumably, the agreed upon 20% reduction in purchase price adequately covered these adjustments. There was no evidence offered as to increased costs and while there was talk of a

need to fill orders or suffer consequences, no evidence was offered to substantiate that claim. Sandell, therefore, cannot claim that the value of the foam was substantially impaired.

Finally, a strict interpretation of the fourth requirement of M.G.L. Ch. 106 § 2–608, that revocation of acceptance occur before any substantial change in the condition of the goods not caused by their own defect, would preclude Sandell from revoking its acceptance under the facts of this case. After all, Sandell did treat a portion of the February shipment with a variant of its usual polymer treatment and no evidence was offered of what effect or changes may have resulted from this new treatment.

I turn now to Sandell's argument that a purchaser of defective goods may recover consequential damages where, knowing of the defects, he nevertheless retains and uses the goods in order to satisfy his contract requirements with customers in the usual course of business. This argument is equally without merit under the facts of this case.

█ Counsel for Sandell is correct in stating that the crux of the issue facing the Court is whether Sandell's losses could not reasonably be prevented by cover or otherwise. M.G.L. Ch. 106 § 2–715(2)(a) states that consequential damages resulting from the seller's breach include any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know *and* which could not reasonably be prevented by cover or otherwise. Thus, even if I find that G. S. F. knew of the particular use to which Sandell put its foam, and I find that they only had the most general knowledge that Sandell treated the foam to make it a waterproofing material, I would also have to find that Sandell's losses on the E. B. Jones and the Baltimore Stadium projects could not reasonably be prevented by cover or otherwise. With respect to the Baltimore Stadium job, the facts simply do not support such a finding.

Sandell began shipping Polytite manufactured from the February foam to the Balti-more job in May through July, 1980. I have found that Sandell was well aware of the foam's problems in February. In fact, Sandell had already experienced a problem on the Jones job. More importantly, there was no evidence that Sandell was unable to purchase substitute foam during this period. To the contrary, the evidence indicates that Sandell could have purchased substitute foam and, in fact, did purchase substitute foam from Rogers, another foam supplier. Thus, Sandell does not meet the special requirements of M.G.L. Ch. 106 § 2–715(2)(a) on the Baltimore Stadium job, since its damages could reasonably have been prevented by cover. Moreover, there was no evidence to indicate that such cover purchases would have involved undue risk, expense or humiliation. 11 Williston, *Contracts* § 1353 (Jaeger, 3d ed. 1968). The G. S. F. foam was a standard, open–celled foam and there was no evidence that it could not reasonably, and without undue risk or expense, have been supplied by other foam manufacturers as it, in fact, was.

Also, as previously indicated, there was no evidence on which I could find that this foam was either the sole or even the contributing cause of the Baltimore failure. All we know, is a problem developed in Baltimore for which Sandell made an adjustment. No experts or tests were offered as to the part this foam played in the problem or what effect, if any, the enriched polymer treatment may have had, or even if some aspect of the Polytite installation or use contributed to the problem. Counsel for Sandell vainly attempts to differentiate the facts in *Country Club Soda Co., Inc. v. Arbuckle*, 279 Mass. 121, 181 N.E. 256 (1932) from the instant facts. If anything, the facts of that case support my conclusion. In *Country Club Soda, supra*, as here, consequential damages were denied a buyer who used defective goods after it had reason to know of the defects because the buyer could have covered by the purchase of substitute goods. Likewise, counsel's reliance on *Miller v. Raymond Metal Products*, 265 Md. 523, 290 A.2d 527 (1972) is unwarranted. In that case, plaintiff's claim to consequential damages was denied, in part, because of plaintiff's failure to avail itself of the op-

portunity to mitigate its damages. Here, Sandell, knowingly and deliberately, chose to keep the goods at a discounted price rather than return them and obtain more suitable foam. It was the party most familiar with its unusual use of the foam. G. S. F. did not purport to make foam for other than furniture and packaging. It had no other customers who used foam for waterproofing. Foam is inherently like a sponge, not naturally a waterproof material. It becomes such a product only through Sandell's patented chemical and pressure treatment of which G. S. F. had only the most rudimentary knowledge. There was nothing in G. S. F.'s knowledge or experience which made Sandell's consequential damages foreseeable. If Sandell, whose process and patent it was, knowing full well of the foam's defects, was satisfied to take a credit and continue to use it anyway, there can be no basis in law or equity for awarding consequential damages. This is so even if it could be shown that the foam was the cause of the problem. We are not dealing with the problems of a hidden or concealed defect, nor an untutored and uninformed buyer who was ignorant of the consequences likely to arise from the defect. We are dealing with technically well educated business men who are required to be bound by their decision when they knowingly make a judgment not to return unsuitable merchandise but, rather, to settle for an allowance and use the same, especially in the absence of proof of a compelling need for immediate performance.

The same problem exists as to a recovery on E. B. Jones' job, except that considering shipment as early as March 4, it seems reasonable to find that this did not allow enough time for Sandell to purchase substitute foam and to turn it into Polytite in time to meet the E. B. Jones order. The foam was processed during the period of testing and discussion and, obviously, before the letters of March 5 and March 6.

■ Thus, with respect to the Jones job, Sandell could not be expected to have reasonably prevented its damages by cover. M.G.L. Ch. 106 § 2–715(2)(a). There exists the problems of little or no evidence of direct causal relation or that this might have involved undue risk, expense or humiliation to Sandell if it could not fill the E. B. Jones order on time. Williston, *Contracts, supra.* Nevertheless, as a matter of equity and good conscience, I will allow Sandell to be credited against the purchase price the damages on the Jones job. The only evidence presented on the issue of damages indicates that Sandell suffered $1,800.00 in damages on the E. B. Jones job.

■ I therefore find, starting from Sandell's letter of March 6 which was apparently accepted and not disputed by a communication from G. S. F. prior to this suit, that Sandell is indebted to G. S. F. in the amount of $5,839.47 from which it is entitled to a credit of $1,800.00 on the Jones job. Since the foam cell structure doesn't affect its use for G. S. F. regular customers but may not be now, with the benefit of hindsight, readily suitable for Sandell's special use, to the extent that Sandell still possesses and desires to return any foam from the February shipment that is still in its original cartons and which has not been subject to Sandell's chemical treatment or otherwise allowed to deteriorate beyond that of normal storage, it may be returned for pro rata credit based on the March 6 letter.