APPLIANCES, INC. AND ANOTHER v. QUEEN STOVE
WORKS, INC.[1]

February 25, 1949.

No. 34,765.

[1]Reported in 36 N. W. (2d) 121.

*Meighen, Knudson, Sturtz & Peterson,* for appellant.
*Peterson & Peterson,* for respondents.

KNUTSON, JUSTICE.

Plaintiffs, Appliances, Inc., and The Cincinnati Oil Works Company, are corporations organized under the laws of Ohio. Appliances, Inc., is wholly owned by and is a subsidiary of the parent corporation, The Cincinnati Oil Works Company. The Cincinnati company is involved in this litigation only for the reason that the credit of Appliances, Inc., had not been established, and it was necessary to use the credit rating of the parent corporation in order to do business. Inasmuch as the interests of the two are coextensive, we shall refer to both corporations jointly as plaintiff. They were engaged in business as wholesale distributors and jobbers of oil heaters and other appliances during the time material herein.

Defendant is a corporation engaged in the business of manufacturing oil heaters at Albert Lea, Minnesota. It deals with distributors or jobbers, who in turn resell the goods manufactured by defendant to dealers.

Beginning in 1941, plaintiff had represented defendant as the exclusive representative of its products in certain counties in Ohio, Indiana, and Kentucky. After our entry into the war, very little business was done between the companies. In the early part of 1945, representatives of plaintiff and defendant met in Chicago and there discussed the matter of renewing this relationship. There was some conversation respecting the matter of again having plaintiff represent defendant as its exclusive distributor in approximately 20 counties in the three states above mentioned. No formal franchise or contract was signed. On April 5, 1945, plaintiff wrote defendant as follows:

"During our visit to Chicago in January, we worked out counties which we could cover for our territory with Mr. Trow. In the event

that these have been misplaced, we will list them again for you as follows [counties were thereafter listed]:

"We shall look forward to receiving our formal franchise agreement."

On July 20, 1945, defendant wrote plaintiff:

"* * * we hereby give you exclusive distribution on the Superflame oil heater line in the territory you cover.

"We are very pleased to have you sell our line and as you mentioned over the telephone, if you have certificates at this time for a carload of heaters, we would suggest that you get your order in to us, so we can include it in our production schedule."

On August 17, 1945, plaintiff sent defendant an order blank covering 240 units of oil heaters. On August 31, 1945, defendant wrote plaintiff as follows:

"We expect by tomorrow afternoon to have our figures on production for the balance of this year set up. Then we will let you know just how many heaters we can give you for the balance of this season and when they will be shipped."

Thereafter, on September 4, 1945, defendant wired plaintiff as follows:

"We have set you up in our production schedule for the balance of the year for 340 heaters. *We will ship* your first car in Sept. Second car in Oct. Third car in Nov. Will make only 4299T 4211DR 4211LR and 4209C for balance of this year. [Italics supplied.]
                                        "Queen Stove Works"

Following receipt of this wire, plaintiff wrote defendant as follows:

"We are enclosing our purchase order for 100—#4211 DR Superflame Oil Heaters

"This together with our previous purchase order #6056 will make up our allocation of 340 to be shipped one carload each September, October and November. We shall appreciate your distributing these

four models over each of the three cars as nearly equally as possible.

"We were very grateful to receive your telegram giving this allocation, and are pleased to state that we have orders on file now to cover nearly all of these shipments."

On the same date, plaintiff mailed to defendant a formal order for 100 additional units of heaters to make up the 340, together with the order formerly sent covering 240 units.

In compliance with the above orders, defendant shipped plaintiff 116 heaters on October 25, 1945, in one carload. On November 26, 1945, another carload of 90 additional heaters was shipped to plaintiff. Thereafter no further heaters were shipped. During the early part of January 1946, defendant appointed another distributor for its products in the territory theretofore assigned to plaintiff and refused to ship any further heaters to plaintiff.

It is the contention of plaintiff that a valid contract was entered into between the parties under which defendant contracted to sell and deliver 340 heaters at the agreed price and that it has failed to complete performance of this contract, for which plaintiff claims damages based upon the loss of profits covering the units which were not shipped. Defendant contends that the evidence is conclusive that no contract was entered into; that ration certificates were required before any contract could be entered into, and, inasmuch as such certificates were not furnished by plaintiff, there could be no contract; and that the evidence of loss of profits is too conjectural and speculative to form a basis for the verdict, if we assume that a contract was made.

The case was tried to a jury, and a verdict was rendered in favor of plaintiff for $1,000. Thereafter, defendant moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. The motions having been denied, this appeal followed.

■ Defendant's first contention is that there is no evidence to support a finding that a valid contract had been consummated between plaintiff and defendant. The trial court, under proper instruc-

tions, submitted the question to the jury as to whether or not a contract for the purchase of 340 heaters had been consummated. The jury found in the affirmative. The finding is amply supported by the evidence. Plaintiff's order and defendant's acceptance are unequivocal. There are no qualifications attached to either. Under the circumstances, the jury could well find that a binding contract had been consummated. H. H. King & Co. v. Dahl, 82 Minn. 240, 84 N. W. 737; King v. D. E. Ryan Co. 179 Minn. 385, 229 N. W. 348; Greenhut Cloak Co. v. Oreck, 130 Minn. 304, 153 N. W. 613.

■ Much of defendant's brief is devoted to the argument that plaintiff and defendant could not have entered into a valid contract for the reason that plaintiff did not then have OPA ration certificates covering the order which it claims to have given defendant for 340 heaters manufactured by defendant. This argument is untenable for several reasons. OPA ration certificates would not have been required until the date of delivery in any event, and prior to the date of delivery under the contract which plaintiff contends was entered into such certificates were no longer required. This is apparent from the admitted facts that two carloads of heaters were shipped to plaintiff without any OPA ration certificates. During the time that ration certificates were required, failure to furnish them might have excused delivery, but it would not prevent the parties from entering into a contract for future delivery. Inasmuch as the requirement for certificates had been discontinued prior to the delivery date, this obstacle to performance of the contract no longer existed. It is also apparent that defendant did not base its failure to complete delivery upon a lack of ration certificates. Even after it had terminated plaintiff's distributorship in January 1946, defendant wrote plaintiff on March 29, 1946, regarding performance of the contract, as follows:

"The reason we haven't shipped you the car of Superflame oil heaters is because of us being out of production for the past three or four weeks, on account of not having steel. In fact, we haven't received one car of steel since the mills went on strike and at this time we don't know when we will be back in production again.

"Just as soon as we are in a position to ship you a car, we will get in touch with you."

Again, on June 14, 1946, defendant wrote plaintiff as follows:

"I am very sorry but it is simply impossible for us to give you any more Superflame oil heaters, due to the fact that our production for 1946 has been cut almost 20%, due to first the steel strike and then the coal strike.

"In fact, it isn't going to be possible for us, operating our plant three shifts, six days a week, to fill the orders we now have on hand."

Nowhere in the evidence, either in the written communications or telephone discussions, does it appear that defendant based its failure to complete delivery upon a lack of ration certificates. The only reason for failure to complete delivery is undoubtedly reflected in defendant's letter of January 24, 1946, which reads as follows:

"This is to advise you that we now find it necessary to make a change in our distributor setup for the Cincinnati territory, so it won't be possible for us to ship you any more Superflame oil heaters."

In any event, the requirements for OPA ration certificates on stoves was abolished on August 15, 1945, by order of the OPA administrator. See, 10 Fed. Reg. 10121, F. R. Doc. 45-15090, filed August 15, 1945.

Authorities cited by defendant in support of its contention that it would be unlawful to enter into such contract without first furnishing OPA ration certificates all relate to the unlawful performance of such contracts rather than to the making of the contracts themselves. It may be conceded that it would be unlawful, at a time when ration certificates were required, to deliver stoves without procuring such certificates; but it does not follow that all contracts for future delivery are void simply because the purchaser for resale did not have in his possession, at the time of making the contract, certificates to cover the goods that were to be delivered

in the future. If we are to carry defendant's argument to its logical conclusion, we should be forced to admit that defendant violated the law in delivering the two carloads it did ship to plaintiff. That is obviously not true, because at the time of shipment certificates were no longer required. It follows that it would be no more unlawful to complete the contract in full than to complete it partially, as was done.

■ It is next contended that because of the restrictions placed on the use of scarce material by the United States government defendant could not manufacture as many units of heaters as it had intended and that plaintiff was treated as well as other purchasers. It may well be true that the number of units defendant could produce was dependent upon the amount of steel it could procure, as steel still was under the control of the government through its system of allocation of scarce material; but it is apparent that defendant did produce enough heaters to fulfill its contract with plaintiff, if it had seen fit to do so, either during the last months of 1945 or the early part of 1946. Plaintiff was willing to accept delivery during all of 1946. Defendant actually shipped to the distributor who took over plaintiff's territory a total of 1,224 heaters in 1946. Of these, 90 were shipped on January 24; 230 on February 19; and thereafter at regular intervals during each month except April and May additional heaters were shipped to such distributor. Defendant's production of heaters increased during 1946 so that it manufactured approximately 70,000 heaters as compared to 20,000 to 30,000 during 1945. It seems apparent that failure to complete the contract with plaintiff was not due to lack of material, but was due to the fact that defendant chose to deal with another distributor.

■ The last contention of defendant is that proof of damages based on loss of profits is too conjectural and speculative in this case. With this we cannot agree. Plaintiff's proof shows exactly what the heaters cost and for what amount they would have been sold. It further shows beyond any doubt that plaintiff had an immediate and ready market for every heater ordered. The only ele-

ment of uncertainty would be the cost of selling the heaters. Here, the evidence shows that there would have been no substantial increase in plaintiff's overhead above that which it already had. The evidence shows conclusively that the heaters were in such demand that they could be delivered to dealers almost on the day they were received by plaintiff from defendant.

It is apparent that at the time involved heaters of a similar type were not available on the market. Hence, plaintiff could not procure similar heaters elsewhere so as to reduce its damages. The ordinary measure of damages based upon the difference between the contract price and the price at which they could be obtained on the market consequently cannot be applied.

In Dreyer Comm. Co. v. Fruen Cereal Co. 148 Minn. 443, 182 N. W. 520, plaintiff was a dealer in flour, grain, and feed. Defendant was engaged in manufacturing and jobbing such products. Defendant contracted to sell five carloads of hominy feed to plaintiff and to deliver the same within 60 days. Defendant defaulted, and plaintiff sought to recover loss of profit on resale. With respect to the measure of damages, we said (148 Minn. 446, 182 N. W. 521):

"* * * The measure of general damages upon a breach by the vendor of an executory contract to sell goods at an agreed price is the difference between the contract price and the market value at the time and place of delivery. * * *

"Special damages may be recovered if they are such as may reasonably be supposed to have been contemplated by the parties, when making the contract, as the probable result of the breach. Paine v. Sherwood [21 Minn. 225], supra, citing Hadley v. Baxendale, 9 Exch. 341. Expected profits from a resale are special damages and may be recovered where the parties may be considered to have contracted in reference to a resale. If, at the time of making the contract, the buyer has an existing contract of resale and the purchase is made in contemplation of such contract of resale, and for the purpose of fulfilling it, and the goods cannot be otherwise procured in the market, and the seller is apprised of these facts,

at the time the contract is made, the buyer may recover the profits he loses by reason of the breach."

See, also, Paine v. Sherwood, 21 Minn. 225, 232; Goebel v. Hough, 26 Minn. 252, 2 N. W. 847; John Newton Porter Co. v. Kiewel Brg. Co. 137 Minn. 81, 162 N. W. 887; Force v. Gottwald, 149 Minn. 268, 183 N. W. 356; and Johnson v. Wright, 175 Minn. 236, 239, 220 N. W. 946, 948, where we said:

"Anticipated profits may be recovered where they are shown to be the natural and probable consequences of the act or omission complained of and their amount is shown with a reasonable degree of certainty and exactness. This means that the nature of the business or venture upon which the anticipated profits are claimed must be such as to support an inference of definite profits grounded upon a reasonably sure basis of facts. Force v. Gottwald, 149 Minn. 268, 183 N. W. 356. This rule does not call for absolute certainty."

It is held by the great weight of authority that the seller's knowledge that the buyer is a dealer in the kind of goods purchased is sufficient to impute to the seller notice of the fact that the goods are intended for resale, and to charge him upon his breach of a sale contract with special damages based on the buyer's resale of the goods in the ordinary course of business, although the seller had no knowledge of any actual resale or specific customer to whom the goods were intended to be resold, and there was none at the time of the original sale. Annotation, 88 A. L. R. 1471.

In the case now before us, defendant knew that plaintiff was a distributor or jobber. It knew that plaintiff purchased the heaters for the purpose of resale to dealers. There can be no doubt that the parties contemplated such resale at the time of making the contract and that defendant knew that plaintiff made its profit by reselling the heaters to dealers. Hence, the above rule applies.

Affirmed.