## BEMIDJI SALES BARN, INC. v. GILBERT CHATFIELD.

250 N. W. 2d 185.

January 21, 1977—No. 46655.

---

*Tupper & Smith, Harlan E. Smith,* and *Kimball D. Mattson,* for appellant.

*Murphy, Lano, Kalar & Murphy, William Kalar,* and *O. C. Adamson II,* for respondent.

Heard before Rogosheske, Peterson, and Scott, JJ., and considered and decided by the court en banc.

ROGOSHESKE, JUSTICE.

Defendant, Gilbert Chatfield, purchased breeding heifers from plaintiff, Bemidji Sales Barn, Inc., at auction. Upon defendant's refusal to make good his check for payment or to return the cattle, plaintiff sued defendant for the purchase price. Defendant counterclaimed, alleging damages resulting from a breach of an express warranty by plaintiff that the cattle were properly vaccinated for shipping fever and breach of an implied war-

ranty of merchantability. The trial judge, sitting without a jury by agreement of the parties, found a breach of the express warranty alleged and awarded defendant special damages totaling $3,614. This amount was the aggregate of $1,114 for veterinary fees, $500 for incidental expenses incurred by defendant's care and treatment of the cattle, and $2,000 consequential damages for cattle deaths caused by plaintiff's breach. This award was offset against the award to plaintiff of $10,982 for the auction sale price of the cattle. Additional consequential damages claimed by defendant for loss of a 1973 "calf crop" and the cost of feed and care for the period during the animals' convalescence and nonproductivity were disallowed. Defendant's appeal challenges only the adequacy and propriety of the consequential damages awarded and disallowed. We affirm the trial court's disposition including the disallowance of additional consequential damages claimed by defendant.

On the afternoon of March 9, 1972, defendant attended an auction on the premises of plaintiff in Bemidji and purchased 62 head of mixed heifers. The purchase of these cows was intended to double the size of defendant's already existing breeding herd from 62 to 124 head. Before the auction commenced, the auctioneer represented that the cows had been "vaccinated for shipping fever and were ready for the farm." However, as the trial court found, the cattle had only been vaccinated the day before, and since at least 2 weeks are needed to develop adequate immunity, the vaccinations had little if any preventative effect.

Immediately following the sale, defendant had the cows shipped by truck from the sales barn to his ranch in Boy River. When the cattle arrived on the evening of March 9, some of the cattle had already started coughing and defendant was concerned that they might have contracted shipping fever. For the remainder of that night the 62 new head were closely confined in a 66- by 30-foot area inside defendant's barn. Early the next morning, after defendant noticed that one of the new cows was dead and two others were down, he contacted his veterinarian,

who examined the cattle and diagnosed the problem as shipping fever. The doctor prescribed various drugs to treat the disease, and, further, advised defendant to keep his healthy cows separate from the sick ones. Thereupon, defendant immediately stopped payment on the check he had given plaintiff for the purchase price of the animals.

Treatments by the doctor continued for the next month while the cattle remained enclosed in the barn. During this time the old herd came into frequent contact with the new inside the barn, where only a wooden fence separated the two herds. Eventually, the shipping fever epidemic spread throughout the newly purchased herd, and some of the cows in the old herd also became infected with the highly contagious disease. Toward the end of March, an epidemic of pinkeye broke out which affected both herds, and by July 30 at least 19 cows had died, 17 of the new cows and 2 of the old herd, ostensibly from either shipping fever or pinkeye. Six additional head were also allegedly lost from the epidemics, but the evidence casts doubt as to the actual causes of death. The bloated bodies of two of these cows were found in defendant's field, but no post-mortem examination was ever conducted to determine the cause of death, and the bodies of the remaining four were never found.

Originally defendant planned to breed both herds in July 1972, which would have produced a "calf crop" during the year 1973. Due to the epidemics, however, the animals had lost approximately 50 to 75 pounds each and the veterinarian advised against breeding the herds in July. Even through there was some evidence indicating that the cattle had regained their weight by the fall of 1972, defendant did not breed his herds until the following spring, thus losing the entire "calf crop" intended for 1973.

The trial court's award to defendant of $3,614 in consequential damages arose from plaintiff's undisputed breach of an express warranty created at the time of sale under Minn. St. 336.2—313 when material representations were made that the cattle "had been vaccinated for shipping fever and were ready for the

farm."[1] Consequential damages, as defined by § 336.2—715(2),[2] are fully recoverable for breach of warranty under § 336.2—714(3). Before reviewing defendant's assignments of error, we emphasize that although remedies are to be "liberally administered," § 336.1—106, the burden of pleading and proving consequential loss still remains on the buyer. § 336.2—715, U.C.C. Comment 4, 21A M. S. A. p. 727.

Defendant first challenges the trial court's disallowance of damages for the lost "calf crop" in 1973 and the cost of feeding and maintaining the nonproductive heifers during this period. Lost profits, provided they are foreseeable by the seller, are clearly recoverable under § 336.2—714(3), and were long recognized as a form of compensable damage prior to adoption of the Uniform Commercial Code. Appliances, Inc. v. Queen Stove Works, Inc. 228 Minn. 55, 36 N. W. 2d 121 (1949); Lanesboro Produce & Hatchery Co. v. Forthun, 218 Minn. 377, 16 N. W. 2d 326 (1944). Additionally, a buyer may seek recovery of excess feed and care costs required to maintain breeding animals that are nonproductive due to a seller's breach of warranty. See,

---

[1] Minn. St. 336.2—313 provides in pertinent part: "(1) Express warranties by the seller are created as follows:

"(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

"(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description."

[2] Minn. St. 336.2—715(2) provides: "(2) Consequential damages resulting from the seller's breach include

"(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

"(b) injury to person or property proximately resulting from any breach of warranty."

W & W Livestock Enterprises, Inc. v. Dennler, 179 N. W. 2d 484 (Iowa 1970).

The weakness of defendant's argument, however, is that he failed to adequately prove at trial that his losses were the result of plaintiff's breach. While it is undoubtedly true that the heifers were too debilitated from the shipping fever to be bred in July 1972, there was no substantial explanation for defendant's prolongation of the breeding vacation until the following spring. It is entirely probable that the weight loss suffered by the cattle had been completely recovered by the fall, which would still have permitted a calf crop for 1973. Moreover, there was conflicting expert testimony as to whether the heifers could have been successfully bred in July even if they had remained healthy. We therefore hold that the trial court's refusal to award damages for the loss of a calf crop and for food and care costs is not clearly erroneous justifying appellate relief. Rule 52.01, Rules of Civil Procedure.

Defendant also appeals the court's $2,000 limitation placed on damages awarded for cattle deaths. This figure was established by the trial judge because of uncertainty in the actual number of cattle that perished from shipping fever and because "contributory negligence undoubtedly helped magnify the losses" claimed by defendant.

We initially reject defendant's assertion that $4,428.25 should have been awarded, based on a loss of 25 heifers at an average price of $177.13 per head. The bodies of four of these cattle were never found, and in the case of two others there was insufficient evidence to determine whether shipping fever had in fact been the cause of death. At best, defendant only met his burden of proving the loss of 19 heifers, which would have entitled him to a maximum award of $3,365.

We further hold that the additional reduction of damages to $2,000 is justified, although the trial judge should more correctly have predicated his finding on defendant's failure to avoid injurious consequences of plaintiff's breach rather than on con-

tributory negligence. The doctrine of avoidable consequences, unlike contributory negligence, takes effect only *after* a legal wrong has occurred, but while some damage may still be prevented. Prosser, Torts (4 ed.) § 65, p. 422. While the law provides the claimant with a remedy whether he seeks to avoid injurious consequences or not, the amount of damages recoverable is limited to the extent that he acted reasonably to prevent his own loss. Casper v. Frederick, 146 Minn. 112, 177 N. W. 936 (1920); Restatement, Contracts, § 336, *comment d.* In the present case, the burden of proof rests with plaintiff to establish that defendant acted unreasonably in failing to arrest the spread of shipping fever after it became apparent that plaintiff's express warranty regarding proper vaccination had been breached. Lanesboro Produce & Hatchery Co. v. Forthun, 218 Minn. 377, 16 N. W. 2d 326.

Expert testimony at trial indicated that the spread of shipping fever can be significantly reduced by separating the sick animals from the healthy ones, and defendant, an experienced rancher, knew of this precautionary measure. Yet, the new herd was continuously confined in a 66- by 30-foot area for well over a month, where the spread of the highly contagious disease was virtually insured. The infection of the old herd with shipping fever can easily be explained by the fact that only a wooden fence separated the two herds. On these facts we are persuaded that plaintiff met his burden of proving that at least some of the cattle deaths could have been averted had defendant practiced proper animal husbandry.

Affirmed.