Kathleen **BECK**, Trustee of Custom Concepts, Incorporated, et al., Respondents,

v.

**PLASTIC PRODUCTS COMPANY, INC., Appellant.**

No. C4-87-526.

Court of Appeals of Minnesota.

Sept. 15, 1987.

Review Denied Nov. 18, 1987.

Bradlee Karan, Stuurmans & Karan, P.A., Minneapolis, for respondents.

Robert G. Rancourt, Lindstrom, for appellant.

Heard, considered and decided by HUSPENI, P.J., and WOZNIAK and CRIPPEN, JJ.

## OPINION

WOZNIAK, Judge.

This is the case of the "Magic Crystal Ball." Respondent Custom Concepts, Inc. (Custom), as buyer, brought this action against appellant Plastic Products Company (Plastic), as manufacturer-seller, for damages caused by Plastic's alleged breach of express warranties for its failure to manufacture and sell goods conforming to the contract terms.

The trial court found that Plastic breached express warranties by producing nonconforming crystal balls and awarded Custom $99,585.25, plus costs and disbursements. Plastic appeals from the judgment and the order denying its motion for a new trial. We affirm.

## FACTS

Plastic is a Minnesota corporation engaged in the business of making plastic parts by plastic injection molding, including parts for plastic toys. Before its dissolution in August 1983, Custom was in the business of designing and selling toys to be used as premium promotions. Custom had previously placed orders with Plastic for

plastic toys pursuant to contracts Custom had with the Martin-Brower Company and M-B Sales.[1]

The Magic Crystal Ball designed by Custom contemplated a hollow, plastic ball enclosing a paper cube. The child-player was to "ask a question" of the ball, shake it, and turn it upside down to peer through a clear surface in order to read an answer printed on one of the faces of the paper cube. McDonald's restaurants intended to include the toy as a "premium" in some of the children's selections on its menu. Custom developed and designed the concept for the Magic Crystal Ball; the plastic crystal balls were manufactured for Custom by Plastic. The entire process for producing the crystal balls consisted of the following steps: (1) Custom's design of the concept in an engineering drawing; (2) Plastic's fabrication of a small prototype or model mold; (3) Plastic's molding sample balls in the prototype mold to be tested for safety; (4) Plastic's making a larger production mold consistent with the prototype mold; and (5) the production run of the crystal balls in the production mold.

All these steps in the process were done in this case. Robert Claussen, an engineer and employee of Custom, converted the design for the crystal ball into an engineering drawing that was approved by McDonald's. Plastic created a prototype mold following the specifications in Claussen's drawing. Shortly thereafter, McDonald's cancelled their order, objecting to the design for aesthetic reasons. Claussen then redesigned to overcome McDonald's objections. McDonald's subsequently approved the new design, and Plastic was given the revised drawing and proceeded to make the required changes in the prototype mold.

In mid-October 1982, Plastic proposed six revisions to the prototype mold as necessary to overcome a manufacturing problem which had developed in the molding process itself and which had nothing to do with Claussen's revised drawing. Custom agreed to the six revisions and, shortly thereafter, requested prototype samples of the crystal ball to send to U.S. Testing, a New Jersey testing laboratory that evaluates consumer products for quality and safety. The sample balls were received that same day, packaged, and sent for testing. The prototype samples passed the "mechanical hazards" safety tests on or about November 3, 1982.

Subsequently, by purchase order dated February 15, 1983, Custom confirmed an order from Plastic for 1,785,500 crystal balls, *"per U.S. Testing approved prototype"* (emphasis added). This purchase order specified that the material was to be general purpose styrene with a light yellow tint. The tint was added at McDonald's request. Plastic accepted the purchase order on February 24, 1983.

Custom notified M-B Sales that the production mold for the crystal ball had been completed and indicated the production schedule for the crystal ball. In mid-March 1983, M-B Sales notified Custom that production-run samples of the crystal ball should be sent to U.S. Testing for testing. Previously, McDonald's had required testing only of the prototype run, not the production run. Later that month, Custom obtained samples from Plastic and sent them to U.S. Testing.

On April 4, 1983, Custom received a telephone call from M-B Sales, reporting that the production-run samples were failing the safety tests and asking that all shipments be held. Custom then notified Plastic to hold all shipments. Because of time constraints in the promotional campaign of which the Magic Crystal Ball was to be a part, McDonald's cancelled its order. On April 11, Custom notified Plastic that the crystal ball project was off.

Meanwhile, Custom had conducted some tests of its own and notified Plastic that the walls of the production-run samples were thinner than the walls of the prototype samples and were thinner than called for by the engineering drawing to which the prototype and production tools were to

---

1. The Martin-Brower Company distributes products and supplies to McDonald's Corporation and its retail operations. M-B Sales is the sales division of the Martin-Brower Company and procures for McDonald's, among others, premium items to given away to children.

have conformed. Plastic indicated that it had thinned the edges of the walls so that the cavities of the production mold would fill uniformly.

Evidence concerning U.S. Testing's tests, both of the prototype balls in October-November 1982 and of the production-run balls in March-April 1983, was admitted by way of exhibits and deposition testimony over Plastic's objections. In a related evidentiary matter, Custom brought a motion under Rule 26, Minn. R. Civ. P., to preclude testimony from Plastic's expert witness because Plastic had failed to adequately answer Custom's interrogatories concerning the expert's testimony. The court agreed that the answers were incomplete and extended to Plastic the opportunity to call its expert at a later, adjourned session of the trial, if Plastic supplemented certain discovery requests and presented the expert for deposition. Plastic declined the invitation and proceeded to trial.

The trial court made extensive findings concerning the testing of the crystal balls, but noted "the critical events in the series of tests we discuss in this section are beyond dispute and are agreed upon by everybody, namely: that U.S. Testing approved or passed the *prototype* balls and that U.S. Testing did not approve—'failed' —the *production* balls." To account for the difference, the court found that the six revisions that were incorporated into the prototype mold resulted in a thinner-walled prototype and that U.S. Testing had tested and passed the thicker-walled, prerevision prototypes, but had failed the thinner-walled, postrevision prototypes. The court determined that the prototype samples which Custom obtained from Plastic in mid-October and sent to U.S. Testing were from the prototype before the six revisions.

The court concluded that the failure of the production-run balls to conform to the U.S. Testing-approved prototype balls constituted a breach of express warranties and was the direct or proximate cause of McDonald's cancellation of the Magic Crystal Ball project and of Custom's damages,

awarding $52,858.41 in out-of-pocket losses and $46,726.84 in lost profits.

## ISSUES

1. Is the evidence sufficient to support the trial court's findings and conclusions that appellant made and breached express warranties?

2. Did the trial court err in determining that appellant cannot avoid the contract under the doctrine of mistake?

3. Is the evidence sufficient to support the trial court's findings and conclusions that respondent gave proper and timely notice of appellant's breach and properly revoked acceptance of or rejected the goods?

4. Is the evidence sufficient to support the trial court's findings and conclusions that appellant's breach directly and proximately caused respondent's damages?

5. Did the trial court abuse its discretion in admitting in evidence the certain testing results and by refusing to allow appellant's expert to testify?

## ANALYSIS

1. Plastic first challenges the findings and conclusions that it made and breached express warranties. A trial court's factual findings must not be set aside upon appellate review unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of a witness. Minn. R. Civ. P. 52.01; *Peterson v. Johnston*, 254 N.W.2d 360, 362 (Minn.1977). In contrast, the conclusions of law are not binding on this court if the trial court improperly applied the law to undisputed facts. *A.J. Chromy Construction Co. v. Commercial Mechanical Services, Inc.*, 260 N.W.2d 579, 582 (Minn. 1977).

■ An express warranty is not defined under Minn. Stat. § 336.2–313(1) (1986), which merely identifies the manner by which an express warranty may be created.[2] It is not necessary to the creation of

**2.** Minn. Stat. § 336.2–313(1) (1986) provides:

(1) Express warranties by the seller are created as follows:

an express warranty that the seller use formal words such as "warranty" or "guarantee." Minn. Stat. § 336.2–313(2). · Here, the evidence shows that in February 1983 Custom specifically requested, and Plastic agreed to produce, crystal balls conforming to the prototype samples *approved by U.S. Testing*. As the trial court correctly found, this language constituted an affirmation or promise creating an express warranty that the goods would conform to the approved prototype samples.

■ Plastic insists, however, that, even if express warranties were created, the warranties were not breached, but were negated by the six revisions and the modification that added a yellow tint to the crystal ball, changes to which Custom agreed. Plastic argues that Custom authorized the revisions and modification that resulted in a prototype different from the one originally contemplated and to which the warranties would otherwise apply. This argument, however, ignores the evidence that Plastic initiated the changes, proposing the revisions to overcome a manufacturing problem, and that Custom relied on Plastic's expertise as a molder in consenting to the revisions.

Furthermore, thinning the walls was not one of the six revisions to which Custom agreed. Only after the production balls failed the safety tests did Plastic tell Custom that the walls had been thinned. The revisions certainly resulted in a thinner-walled production-run ball that could not pass the same safety tests that the prototype samples had passed. The balls that Plastic provided were defective in that the thickness of their walls did not conform to the thickness of the walls of the prototype samples approved by U.S. Testing. Abundant evidence makes it inescapably clear that Plastic made and breached its express warranties that it would produce crystal balls that would conform to the approved prototype samples.

■ 2. We reject Plastic's next argument that the contract is voidable because the parties were mutually mistaken as to which prototype (prerevision or postrevision) samples were actually approved by U.S. Testing and to which Plastic warranted conformity. Plastic initiated the revisions that resulted in there being pre and postrevision prototypes in the first place. It produced samples from the prototype mold in mid-October 1982 and supplied the actual prototype balls to Custom, which in turn sent them on to U.S. Testing. Clearly, Plastic was in a better position to establish exactly which prototype was being sent for testing and, under the circumstances, it is reasonable that it bear the risk of any mistake. *See* Restatement (Second) of Contracts § 154(c) (1981).

■ 3. Plastic next argues that the trial court erred in holding that Custom gave proper and timely notice of Plastic's breach and properly revoked acceptance of or rejected the goods. *See* Minn.Stat. § 336.2–607(3)(a). Its argument is without merit. Substantial evidence supports the trial court's finding that Custom's conduct toward the goods constituted either acceptance of the goods and later revocation of that acceptance, or a rejection of the goods from the outset. Here, it is not even clear that Custom accepted the crystal balls, but if it did, the record shows that meaningful inspection of the goods occurred in the form of testing by U.S. Testing and that Custom gave notice that the project was cancelled within seven days of learning that the balls were defective. *See* Minn. Stat. § 336.2–606 (1)(a).

■ 4. Plastic next argues that it should not be liable for damages from collateral contracts that Custom made and to

---

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

which Plastic was not a party. Consequential damages, however, are fully recoverable for breach of warranty. *Bemidji Sales Barn, Inc. v. Chatfield*, 312 Minn. 11, 15, 250 N.W.2d 185, 188 (1977). Damages in the form of lost profits may be recovered, provided they are foreseeable by the seller. *Id.*

The evidence shows that Plastic knew the balls were being produced for McDonald's and that McDonald's would not have cancelled the project but for the failure of the production-run crystal balls to conform to the approved prototype. The damages awarded here were only those relating to the crystal ball project, which naturally arose from the breach, and are fully recoverable.

5. Finally, Plastic challenges the trial court's evidentiary rulings, claiming that the court should not have admitted the exhibits and deposition testimony from U.S. Testing and that it should have allowed Plastic's expert to testify. The trial court extended to Plastic the opportunity to call its expert at a later, adjourned session of the trial, if Plastic supplemented certain valid discovery requests and presented the expert for deposition. Plastic declined. A trial court's decision as to the admissibility of evidence will not be disturbed absent a clear abuse of discretion. *Scheper v. Commissioner of Public Safety*, 380 N.W.2d 222, 223 (Minn. Ct.App.1986). On the record before us, we simply cannot say the court abused its discretion.

## DECISION

The trial court is affirmed in all respects.