**BARRY & SEWALL INDUSTRIAL SUPPLY CO., Appellant/Cross–Appellee,**

v.

**METAL–PREP OF HOUSTON, INC., Appellee/Cross–Appellant.**

Nos. 89–5453, 89–5472.

United States Court of Appeals, Eighth Circuit.

Submitted June 11, 1990.

Decided Aug. 23, 1990.

Motion for Rehearing Overruled Oct. 23, 1990.

Gordon B. Conn, Jr., Minneapolis, Minn., for appellant/cross-appellee.

Anthony J. Sadberry, Houston, Tex., for appellee/cross-appellant.

Before MAGILL and BEAM, Circuit Judges and LARSON,* Senior District Judge.

BEAM, Circuit Judge.

Barry & Sewall Industrial Supply Co. appeals the district court's judgment which awarded Metal–Prep of Houston, Inc. $433,000 [1] in damages. Metal–Prep cross-appeals several rulings of the district court. The court found that Barry & Sewall breached an express warranty under a contract for a metal treating oven which it sold to Metal–Prep. We affirm the finding that Barry & Sewall breached its express warranty of line speeds, but reverse the award of damages for increased energy costs and lost profits. We affirm on the issues raised in the cross-appeal.

## I. BACKGROUND

In 1972, Larry Kohlmeyer founded Metal–Prep, a Texas corporation which treated and painted steel coils used in the metal building industry. *See* Trial Transcript, Oct. 1987, at 15. The coils were comprised of strips of steel which were approximately 2000 feet long, twenty-four to forty-two inches wide, and twelve to sixteen gauges thick. Metal–Prep designed a 250–foot processing line at which it unwound the coil and ran it through a wheelabrator, painted the coil in a roll-coater, heat-cured the paint in a gas oven, cooled the painted steel in a quench tank, slit the steel into desired widths, and recoiled the steel as the finished product. Brief for Appellant at 3. The strip of hot steel was difficult to control because of various imperfections such as uneven edges, thickness variations, ir-

---

* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

1. The judgment entered was for $433,000. The district court's opinion, No. 4–81–147, slip op. at 10 (D.C.Minn. June 28, 1989) (Decision II) reflected damage calculations totaling $633,000. However, upon inquiry by Metal–Prep, the court affirmed its intent to enter judgment for $433,000. *See* Joint App. at 222.

regularities in tension, "oil canning," and "camber." These imperfections caused the coil to "wander" laterally, to jump, buck, or stand on edge as it was run through the processing line. Trial Transcript, July 1985, at 658–63. Frequently, the coil line had to be stopped to prevent damage to the oven, which stoppage resulted in the burning of the paint. Therefore, when Metal–Prep decided to build a new production facility, it negotiated with Barry & Sewall for the purchase of an infrared oven which it believed would eliminate the problems associated with the gas oven.

Barry & Sewall operated a systems division which assembled and sold high density infrared ovens. These ovens were custom-designed to heat and cure paint and laminates on coated metal, wood, and other industrial products. Brief for Appellant at 2. Barry & Sewall, however, had never designed infrared ovens for heavy-gauge coil-coating operations and it hoped to create a new market with such ovens. See Trial Transcript, July 1985, at 448–50, 601–03. After extensive discussions and plans by the two parties, Barry & Sewall offered Metal–Prep quotation no. 1276 on June 20, 1979. Barry & Sewall proposed to design and manufacture a complete high density infrared heating and control system for $112,176. On July 26, 1979, Metal–Prep accepted quotation no. 1276 subject to the following additions:

1. Guides incorporated into the oven to protect the infrared heating elements and facilitate positioning.

2. A written acknowledgment of verbal assurances that there will be no burned spots on the strip caused by heat remaining on when the line is stopped.

3. A written acknowledgment of verbal assurances that the coatings used in your demonstrations will be cured at 125 fpm [feet-per-minute] on 16 gauge and 100 fpm on 14 gauge X 48" wide.

Metal–Prep purchase order, Brief for Appellant at 250.

On August 3, 1979, Barry & Sewall acknowledged the additions which Metal–Prep incorporated:

1. Guide rollers will be incorporated into the oven to help protect the lamps and keep the coil from standing on edge.

2. There will be no burned spots on the strip due to heat remaining on when the line is stopped.

3. Most of our testing was done with 14 gauge steel and based on this testing, the 14 gauge will run 90 to 100 FPM. Based on Larry's information on the old oven, this means the 16 gauge should run approximately 115 to 120 FPM. One item I would like to call your attention to is the reference to 48" wide material. It is Larry"s [sic] opinion that he will be able to run 48" wide material at a slower line speed and do a satisfactory job. Although a 48" wide strip will physically fit through the oven, the oven is not designed to cure paint on a 48" wide strip.

Barry & Sewall response letter, id. at 251.

In June of 1980, Barry & Sewall shipped its infrared oven to Metal–Prep's facility where it was installed and operated. From the beginning, the oven was slower than anticipated in its production line speeds. Also, the coil broke an inordinate number of infrared bulbs as it was run through the oven. Metal–Prep reported the complications, and Barry & Sewall responded by inspecting the oven and writing a letter dated July 1, 1980, in which it promised to make various changes to improve line speeds and remedy the other problems. On July 29, 1980, Metal–Prep sent a letter to Barry & Sewall complaining about the delays in remedying the infrared oven problems. Following numerous discussions between the parties, on August 27, 1980, Barry & Sewall agreed to redesign and build a new infrared oven for Metal–Prep at no charge.

In October of 1980, George Krahn, the Barry & Sewall sales engineer most actively involved in the Metal–Prep transaction, left Barry & Sewall. Barry & Sewall never

delivered a new infrared oven. Rather, it insisted that the existing oven conformed to the contract terms. On March 3, 1981, Barry & Sewall sued Metal–Prep in the Hennepin County Minnesota District Court, seeking recovery of the balance due on the contract for the manufacture and delivery of the infrared oven. Metal–Prep purchased the oven through a lease financing arrangement and paid Barry & Sewall $97,-084.60 before shipment. The remaining balance of $16,826.40 was due within thirty days of the start-up of the oven. Metal–Prep did not pay the $16,826.40 balance, nor did it pay for the parts and materials worth $27,446.64 which it allegedly requested from Barry & Sewall.

On March 20, 1981, Metal–Prep removed the case to the United States District Court for the District of Minnesota, and the case was assigned to Judge Diana E. Murphy. Metal–Prep filed a motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer the case to the Southern District of Texas. The district court denied these motions, and on August 12, 1981, Metal–Prep sent a registered letter to Barry & Sewall which stated that "we consider the entire system [infrared oven] to be non-conforming [sic] to the original contract and Metal Prep [sic] hereby revokes its acceptance, and demands full return of the purchase price plus payment of incidental and consequental [sic] damages." Appellee's App. at 88. On August 14, 1981, Metal–Prep filed its answer in which it denied that it owed Barry & Sewall the balance for the oven or the cost of the materials. Metal–Prep also counterclaimed, alleging that Barry & Sewall breached express and implied warranties under the contract, which breaches resulted in consequential and incidental damages to Metal–Prep in the amount of $767,-083.42.

On November 16, 1981, the case was transferred to Judge Paul A. Magnuson. Pursuant to a motion by Barry & Sewall, on March 19, 1985, the court determined that the law of Minnesota should apply rather than the law of Texas. The parties agreed that the case should be bifurcated for purposes of trial with Barry & Sewall's claim and the liability portion of Metal–Prep's counterclaim to be tried first and the damages portion of Metal–Prep's counterclaim to be tried at a later date, if necessary. Thus, the first portion of the trial was conducted from July 8 through July 16, 1985. Judge Magnuson held that Barry & Sewall was entitled to recover the balance of the purchase price, $16,826.40, the cost of materials which it provided, $2,320.97, along with the return of two preheaters. *Barry & Sewall Indus. Supply Co. v. Metal–Prep of Houston, Inc.,* No. 4–81–147, slip op. at 41 (D.Minn. May 31, 1986) (Decision I). Judge Magnuson also found that there were express warranties involving the guide rollers for protection of the infrared lamps and control of the steel, the absence of burned spots, and line speeds. Barry & Sewall, however, breached only the express warranty concerning line speeds. Judge Magnuson held that there was an implied warranty of merchantability for the infrared oven, but this had not been breached. Further, Judge Magnuson determined that there was no implied warranty of fitness for a particular purpose. *Id.* at 40. The court did not mention Metal–Prep's August 12, 1981, letter of revocation.

The second portion of the trial, concerning causation and damages pursuant to Metal–Prep's counterclaim, began on October 21, 1987. On November 13, 1987, Judge Magnuson recused himself and the case was reassigned to Judge Murphy. The case reconvened on October 25, 1988, at the point at which it had been interrupted on November 13, 1987. The testimony and the exhibits presented at the beginning of the trial were adopted as part of the record. The trial was completed on November 1, 1988, and Judge Murphy held that Metal–Prep demonstrated damages in excess of $400,000. *Barry & Sewall Indus. Supply Co. v. Metal–Prep of Houston, Inc.,* No. 4–81–147, slip op. at 9 (D.C. Minn. June 28, 1989) (Decision II). The district court appeared to order judgment for $23,000 for the cost of installing gas-powered edge burners, $210,000 for increased energy costs, $200,000 for lost

profits resulting from inadequate line speeds and $200,000 toward the cost of a new oven. Pursuant to Judge Magnuson's order following the first portion of the trial, Judge Murphy awarded Barry & Sewall $19,147.37. *Id.* at 9–10.

On appeal, Barry & Sewall raises the following arguments: (1) the trial court erred in its first decision because it concluded that there was an express warranty of line speeds and that the warranty had been breached; (2) failure to attain the projected line speeds was due to Metal–Prep's inability to control the steel coil sufficiently to prevent damage to the oven; (3) the trial court erred in failing to address contributory negligence and comparative fault, and consequential damages are barred as a matter of law; (4) energy costs for use of the preheat units are not proper damages for breach of warranty; (5) direct nonconsequential damages awarded for breach of warranty are erroneous because they exceed the original cost of the oven; (6) any consequential damages are barred by Metal–Prep's failure to mitigate; and (7) Barry & Sewall is entitled to prejudgment interest on the balance of its contract claim. Metal–Prep argues that (1) the trial court erred in finding no express warranty on energy costs; (2) the trial court erred in applying Minnesota law; (3) the trial court erred in finding no breach of an implied warranty of merchantability; and (4) the trial court erred in various rulings on pleadings, evidence and damages.

## II. DISCUSSION

### A. *Revocation*

As previously indicated, Metal–Prep claims to have revoked acceptance of the infrared oven in its August 12, 1981, letter to Barry & Sewall. Metal–Prep, however, proceeded to trial with a counterclaim involving breaches of express and implied warranties under the infrared oven contract. Neither judge discussed Metal–Prep's letter of revocation. However, because revocation could materially affect the outcome of the litigation, we will first examine whether Metal–Prep's letter was sufficiently unequivocal to constitute an effective revocation.

The Minnesota Uniform Commercial Code (U.C.C.) § 336.2–608 sets forth a buyer's right to revoke acceptance as follows:

(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

(b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

21A Minn.Stat.Ann. § 336.2–608 (West 1966).

Thus, the Minnesota U.C.C. provides that a buyer can revoke acceptance only if the nonconformity of the unit or lot substantially impairs its value to her. Courts can determine the existence or nonexistence of nonconformity by referring to the terms of the contract, including the law of warranty. Revocation, however, is not limited to goods which are not merchantable under a breach of warranty theory but, rather, the U.C.C. engages a more subjective standard: revocation may be sought for goods whose nonconformity substantially impairs the value to the buyer. *See Blankenship v. Northtown Ford, Inc.*, 95 Ill.App.3d 303, 50 Ill.Dec. 850, 853, 420 N.E.2d 167, 170 (1981). Therefore, once nonconformity has been demonstrated, the buyer must then show that the value of the goods was substantially impaired. In *Durfee v. Rod Baxter Imports, Inc.*, 262

N.W.2d 349, 353 (Minn.1977), the Minnesota Supreme Court set forth guidelines for the establishment of the substantial impairment requirement. The court stated that "[i]ndeed, two respected commentators suggest that the test ultimately rests on a commonsense [sic] perception of substantial impairment, akin to the determination of a material breach under traditional contract law. White & Summers, Uniform Commercial Code, § 8–3, p. 257." *Id.* Professors White & Summers also commented that:

> [t]he Code gives no guidelines to determine which performances are substantially nonconforming and which are only insubstantially so. The common law concept of "material breach" is at least a first cousin to the concept of "substantial nonconformity," and it offers a fruitful analogy to one who seeks to determine whether the seller's performance substantially nonconforms.

1 White & Summers, Uniform Commercial Code § 8–3, p. 403 (3d ed. 1988).

The Minnesota U.C.C. requires the buyer to revoke the contract in an unequivocal and timely manner. Further, upon notice of revocation, the buyer must not indulge in any action which would indicate that he has reaccepted the goods. The question of whether Metal–Prep effectively revoked acceptance of the oven in a timely manner, and whether its post-revocation actions constituted reacceptance of the oven are questions for a trier of fact. *See Johannsen v. Minnesota Valley Ford Tractor Co.*, 304 N.W.2d 654, 657–58 (Minn.1981) (en banc) (issue of what constitutes reasonable time for revocation of acceptance and reasonableness of buyer's use of defective good after revocation is question for jury).

When a buyer accepts the seller's goods and subsequently revokes the contract, the buyer cannot receive the benefits of revocation unless the revocation was deemed to be effective. If the revocation was not effective, the buyer must turn to the remedies provided for breach of warranty. *See Intervale Steel v. Borg & Beck Div., Borg–Warner*, 578 F.Supp. 1081, 1087 n. 20 (E.D.Mich.1984) (buyer's revocation deemed ineffective and "buyer must then turn toward Section 2–714 which provides for the buyer's remedies when he has accepted non-conforming [sic] goods"). Also, if the buyer's revocation was effective, but the buyer subsequently reaccepted the unit by continuing to use it, damages are awarded under a breach of warranty theory. *See Hutchinson Util. Comm'n v. Curtiss–Wright Corp.*, 775 F.2d 231, 240 (8th Cir.1985).

Pursuant to the U.C.C., revocation and a suit for damages are distinct remedies, and a buyer may pursue either or both options. *Solar Kinetics v. Joseph T. Ryerson & Son, Inc.*, 488 F.Supp. 1237, 1242 (D.Conn.1980). These two remedies, however, are not connected. *Id.* The mere fact that a trier of fact finds a seller liable for breach of contract "does not, *ipso facto*, establish an effective revocation of acceptance." *Id.*

In this case, although raised as an issue on appeal, the record indicates that Metal–Prep did not actively pursue a revocation remedy at trial. Rather, Metal–Prep focused on its breach of warranty claims. Neither district court judge addressed the matter and we are not in a position to speculate on their reasoning. We believe, however, that the continuing use of the oven by Metal–Prep defeats this theory. Accordingly, we will treat Metal–Prep's revocation as ineffective, and proceed to consider the breach of warranty remedy as governed by Minn.Stat.Ann. § 336.2–714.

### B. Breach of warranty

Section 336.2–714 of the Minnesota U.C.C. provides:

> (1) Where the buyer has accepted goods and given notification (subsection (3) of section 336.2—607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
>
> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between

the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under the next section may also be recovered.

21A Minn.Stat.Ann. § 336.2–714 (West 1966).

Based upon Judge Magnuson's finding of breach of express warranty, Judge Murphy appears to have awarded Metal–Prep damages as follows: (a) $23,000 for the cost of installing gas-powered edge burners to improve the line speeds of the oven; (b) $210,000 for increased energy costs; (c) $200,000 in lost profits resulting from inadequate line speeds; and (d) $200,000 to cover the 1985 cost of replacing the Barry & Sewall oven with a new gas oven from another supplier.

■ We believe that the cost of a new oven is a "cost of cover" not permitted under the breach of warranty theory pursued by Metal–Prep. It may have been a permissible measure of damages had there been a justifiable revocation of acceptance. *See* 21A Minn.Stat.Ann. §§ 336.2–711, 2–712 (West 1966). Since there was no revocation, we disagree with this $200,000 award.

■ Judge Magnuson, as earlier indicated, found that Barry & Sewall breached an express warranty involving line speeds. We agree with this finding. In its July 26, 1979, purchase order, Metal–Prep accepted quotation no. 1276 subject to assurances of the oven's line speeds. Barry & Sewall acknowledged this addition and created an express warranty in its August 3, 1979, letter of response. Judge Murphy properly awarded Metal–Prep $23,000 for the cost of installing gas-powered edge burners designed to improve the line speeds of the

oven. This $23,000 award is reasonable and is directly related to Metal–Prep's responsibility to attempt to mitigate damages arising from the breach of the warranty of the line speeds. We affirm this holding.

■ Judge Magnuson also determined that there was no express warranty with respect to energy costs. Judge Magnuson stated that Metal–Prep did not refer to reduced energy costs in its purchase order, nor did Barry & Sewall refer to energy costs in its August 3, 1979, letter of response. In addition, any discussions between the parties during negotiations were too vague on the issue of energy costs and, thus, an express warranty was not created. *See Barry & Sewall Indus. Supply Co.,* Decision I, slip op. at 28–29. This finding was not clearly erroneous.

■ Judge Murphy awarded Metal–Prep $210,000 for increased energy costs. Judge Murphy found that Metal–Prep installed extra heating units to increase the oven's heating capacity,[2] which units, in turn, increased the speed of the line. Metal–Prep's energy bill was $5,000 more per month after these improvements. *See Barry & Sewall Indus. Supply Co.,* Decision II, slip op. at 6. It is certainly arguable that the extra energy costs needed to run the additional heating units, which were necessary to increase the oven's line speeds, resulted from the breach of the express warranty of line speeds. However, we think that other findings and other evidence result in a failure of Metal–Prep's proof in this area. First, we have Judge Magnuson's finding, based upon the evidence, that there were no promises made with regard to energy costs. Second, because of this finding, there is no proof that additional heating units, if incorporated in the original installation, could have resulted in a claim for damages for extra energy

**2.** It is not clear from the evidence available in the joint appendix whether these extra electric heating units were installed by Barry & Sewall, Metal–Prep or both. Judge Magnuson found that the preheaters were "loaners" and ordered that the units be returned to Barry & Sewall. *Barry & Sewall Indus. Supply Co.,* Decision I, slip op. at 21. It appears that 54–inch preheater

units were installed in early 1981 and that these units were later moved to the point at which the steel exited the oven. This seems to account for "preheater" unit references in Judge Magnuson's opinion, *id.* and "post heat units" references in Judge Murphy's opinion. *Barry & Sewall Indus. Supply Co.,* Decision II, slip op. at 6.

expenses. In fact, the evidence indicates that Kohlmeyer, president of Metal–Prep, recognized that energy costs could at least double with the new electric oven. *See Barry & Sewall Indus. Supply Co.*, Decision I, slip op. at 8. Thus, the equipment added to make the oven conform to the warranty of the line speeds cannot provide the basis for a finding of $210,000 in energy-use damages.[3]

■ Judge Murphy awarded consequential damages of $200,000 to Metal–Prep for lost profits. However, Judge Murphy found that Metal–Prep's business increased over the years in which it operated the infrared oven, and also found that Metal–Prep was able to fill all of its orders from 1980 to early 1984. Judge Murphy stated that "[f]rom mid–1984 to November 1985, Metal–Prep's lost sales due to the breach of warranty by Barry & Sewall resulted in lost profits in excess of $200,000." *Barry & Sewall Indus. Supply Co.*, Decision II, slip op. at 7–8. Judge Murphy went on to say that "[f]aced with impending lost profits due to the oven's limited capacity, Metal–Prep had a duty to mitigate its damages by ordering a replacement oven at least by early 1984." *Id.* at 8. Judge Murphy found that Metal–Prep had the resources to purchase a $320,000 oven in early 1984. *Id.* The new oven was finally purchased in November of 1985. *Id.* at 6.

After carefully examining Judge Murphy's thorough and well-researched set of financial figures for the years at issue, we are troubled by this award of $200,000. We agree that Metal–Prep lost profits from mid–1984 through 1985 because of the infrared oven's limited capacity. We also agree, however, that Metal–Prep had the resources and the ability to purchase a new oven in early 1984 to attenuate these known capacity limitations. Section 336.2–715(2)(a) of the Minnesota U.C.C. provides:

(2) Consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know *and which could not reasonably be prevented by cover or otherwise.*

21A Minn.Stat.Ann. § 336.2–715(2)(a) (West 1966) (emphasis added).

We believe that sufficient evidence demonstrated that Metal–Prep could have purchased a new oven early in 1984, thus preventing the $200,000 in lost profits. Judge Murphy found that Metal–Prep realized a gross profit of $345,923 in 1980, $720,515 in 1981, $729,992 in 1982, $871,052 in 1983, and $1,314,329 in 1984. In addition, Judge Murphy stated that Metal–Prep's debt to equity ratio had been significantly reduced by 1984, and financing for a new oven would have been obtainable. *Barry & Sewall Indus. Supply Co.*, Decision II, slip op. at 9. We agree with these findings.

Metal–Prep's recoverable damages are limited to the extent that it acted reasonably to prevent its own loss. *Bemidji Sales Barn v. Chatfield*, 312 Minn. 11, 250 N.W.2d 185, 189 (1977). Thus, the finding that consequential damages are due Metal–Prep because of lost profits encountered in mid–1984 and 1985 as a result of the oven's inadequate line speeds is not supported by the evidence.

We think that Metal–Prep may have properly recovered damages based upon the difference in value of the oven as warranted and as delivered if such damages were established by the evidence. *See* 21A Minn.Stat.Ann. § 336.2–714(2). However, Judge Magnuson's finding that no other warranties, express or implied, were breached, a finding with which we agree, coupled with his *unappealed* finding that Barry & Sewall is entitled to payment of the full contract price, preclude such an award here. Thus, we conclude that the

3. Metal–Prep may have properly recovered damages for increased labor charges, additional overhead expenses and other extra costs directly related to the short fall in line speeds. It does not appear that Metal–Prep presented sufficient evidence on these items at trial to support an

award of damages. *See Barry & Sewall Indus. Supply Co.*, Decision II, slip op. at 6 (Metal–Prep "has not sufficiently demonstrated that the breach caused any other increased expenses such as increased labor or maintenance costs.")

proper measure of damages in this matter is $23,000 awarded to Metal–Prep for the edge burners reduced by the $19,147.37 due Barry & Sewall under the sales contract.

## III. CONCLUSION

For the reasons stated, we affirm the award of $23,000 to Metal–Prep for the cost of installing edge burners to improve the infrared oven's line speeds. We reverse the award of $210,000 for increased energy costs, and the $200,000 for lost profits from mid–1984 to November of 1985, and the $200,000 to cover the 1985 cost of replacing the infrared oven. We have carefully reviewed the parties' other arguments on appeal, including those raised by Metal–Prep through its cross-appeal, and find them to be without merit. We remand this matter to the district court for entry of judgment in accordance with this opinion.